LOCAL LODGE NO. 1266, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, Plaintiff-Appellee,

v.

PANORAMIC CORPORATION, Defendant-Appellant.

No. 81–1379.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 25, 1981.

Decided Dec. 30, 1981.

Robert G. Dowling, Shneidman, Myers & Gendlin, Milwaukee, Wis., for plaintiff-appellee.

Robert H. Joyce, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant-appellant.

Before WOOD and CUDAHY, Circuit Judges, and DUMBAULD,* Senior District Judge.

CUDAHY, Circuit Judge.

The issue on this appeal is whether a district court may grant a preliminary injunction restraining an employer from completing a sale of corporate assets pending a decision by an arbitrator on the union's claim that the sale violates the applicable collective bargaining agreement. Because we agree that failure to issue such a status quo injunction under the present circumstances would have resulted in frustration of the arbitral process, we affirm the district court's award of equitable relief.[1]

I.

The controversy in the instant case had its genesis in a decision by the Panoramic Corporation ("Panoramic") to sell its Sintered Specialties Division, located in Janes-

---

* The Honorable Edward Dumbauld, Senior District Judge for the Western District of Pennsylvania, is sitting by designation.

1. In *Howard Johnson Co. v. Detroit Local Joint Executive Board, Hotel & Restaurant Employees*, 417 U.S. 249, 258 n.3, 94 S.Ct. 2236, 2241 n.3, 41 L.Ed.2d 46 (1974), the Supreme Court in dicta suggested that a union alleging a similar breach of the collective bargaining agreement might have been able to obtain an injunction prohibiting a proposed sale of assets by the employer. We now hold that, on the facts presented by the instant case, such relief is available.

ville, Wisconsin. The plaintiff, Local Lodge 1266 of the International Association of Machinists and Aerospace Workers, AFL-CIO (the "Union") is the recognized bargaining representative of the production and maintenance employees at the Sintered Specialties Division. At the time of the filing of the Union's complaint, there were 113 such workers employed by Panoramic, 29 of whom were on layoff with recall rights. A collective bargaining agreement, due to expire on June 30, 1982, is in effect between Panoramic and the Union. This agreement contains a broad arbitration provision,[2] and its Preamble makes the agreement binding on "successors and assigns" of Panoramic.[3] It is the latter provision that forms the basis for the Union's claim that the proposed sale of the Division constitutes a breach of the labor contract.

In December of 1980, employees at the Division were for the first time informed of Panoramic's decision to sell the Division to a group of investors who had formed a corporation known as Sintered Specialties, Inc. ("SSI"). The investors in SSI were identified as officers and supervisors of Panoramic and its parent company, the Parker Pen Company. The employees were told that, although only tentative agreement had been reached, the parties to the sale hoped to close the deal on February 28, 1981. A Vice President of the Sintered Specialties Division further advised the employees that the proposed purchasers contemplated no change in the terms and conditions of employment at the Division, but that some changes might be put into effect at a future time after mutual agreement by the purchasers and the Union. No indication was given whether the purchasers would honor the existing collective bargaining agreement.

During an unrelated grievance meeting on January 29, 1981, a Panoramic official informed the Union that the closing date for the sale of the Division, originally scheduled for February 28, 1981, might be postponed until the end of March. On February 6, the Union learned that the proposed buyers had taken a "new view" with respect to the existing Panoramic employees and were considering a plan under which those employees would be terminated and rehired as new employees. A meeting to discuss the situation was called by Panoramic on February 9, 1981. Panoramic indicated to the Union that it had decided to sell the Division because the operation was incompatible with Panoramic's overall business plans. Panoramic declined to answer the Union's questions regarding the intentions of the purchasers with respect to the existing employees, and insisted that it had no control over the purchasers' plans. Panoramic did note, however, that the closing date had been set for February 28, 1981.

On February 13, 1981, a notice was posted at the Sintered Specialties Division announcing the proposed sale to SSI. The notice informed Panoramic employees that they were being terminated as of February 28 and that they would have to reapply to SSI if they wished to continue their employment at the plant.[4] In letters directed both to Panoramic and to SSI, the Union objected to the notice of termination, requested bargaining over the effects of the sale, and sought from Panoramic a disclosure of the arrangements it had made for carrying out its obligation to require SSI to assume the labor agreement. Replies to these letters were received on February 19. In its response, SSI reported that it had not agreed to assume the obligations of the collective bargaining agreement and an-

2. The arbitration clause in the collective bargaining agreement provides:

> REFERRAL —In the event there arises (in the administration of this agreement) a dispute or difference of opinion between the Company and the Union as to the meaning and interpretation of a particular provision hereof, which dispute or difference arose during the processing of a grievance under the grievance procedure, then the Union or Company may request that the question of interpretation on which such difference of opinion exists be referred to arbitration. . . .

3. The Preamble to the collective bargaining agreement reads as follows:

THIS AGREEMENT was made and entered into this 1st day of July 1979, by and between the PANORAMIC CORPORATION, its successors and assigns, of Janesville, Wisconsin (hereinafter referred to as the "Company") and LOCAL LODGE NO. 1266 of the INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS AFL-CIO (hereinafter referred to as the "Union").

4. Contemporaneously with the February 13 notice, advertisements appeared in local newspapers in the Janesville area soliciting applications for employment with SSI. A large number of non-Panoramic employees were subsequently interviewed by SSI for these job positions.

nounced its decision not to recognize or bargain with the Union.

The Union filed its grievance with Panoramic on February 17, 1981. Although it alleged numerous contract violations pertaining to compensation, seniority, holidays, pensions and insurance, and discharge and discipline, the principal grievance related to the contract's "successors" clause, which the Union interprets as requiring Panoramic to secure from any purchaser, as a condition of sale, an assumption of the obligations of the labor agreement. The Union then requested Panoramic to delay the effect of the February 13 notice pending resolution of the grievance. Panoramic declined this request, but has agreed to arbitration of the contract issue.

On February 20, 1981, the Union filed its Complaint and Motion for Preliminary Injunction and Temporary Restraining Order.[5] The Complaint sought a preliminary injunction to restrain Panoramic, pending arbitration, from completing the sale of the Sintered Specialties Division to SSI or to any other person without first requiring the transferee to assume the labor agreement between Panoramic and the Union. At the conclusion of a hearing conducted on February 27, 1981, the district court granted the requested relief.[6] Panoramic appeals from this ruling.

## II.

The dispute in the instant case lies at the intersection of several fundamental policies embodied in the national labor laws: (1) the policy against judicial interference in labor disputes, 29 U.S.C. §§ 101–115 (1976); *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976); (2) the promotion of peaceful resolution of labor disputes through voluntary arbitration, *Nolde Brothers, Inc. v. Local 358, Bakery & Confectionery Workers*, 430 U.S. 243, 253, 97 S.Ct. 1066, 1073, 51 L.Ed.2d

300 (1977); *Steelworkers* trilogy (*United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1363, 4 L.Ed.2d 1432 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)); and (3) deference to management prerogatives, *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Our task in reviewing the propriety of the preliminary injunction granted by the district court in the instant case, therefore, is to attempt to accommodate these often conflicting policies.

In *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court recognized a narrow exception to the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115 (1976), which broadly prohibits federal courts from issuing injunctions in labor disputes. The Court held that an employer in a federal court action brought pursuant to § 301(a) of the Labor Management Relations Act[7] could secure an injunction against a strike if the collective bargaining agreement between the parties contained a no-strike clause and if the strike involved a grievance that the parties had agreed to submit to arbitration. The union's promise not to strike is generally regarded as the *quid pro quo* for the employer's agreement to submit grievance disputes to the process of arbitration. *See Textile Workers v. Lincoln Mills*, 353 U.S. 448, 455, 77 S.Ct. 912, 917, 12 L.Ed.2d 972 (1957). Thus failure to restrain the union from striking over arbitrable disputes would undercut the purpose of the arbitration provision. 398 U.S. at 247–49, 90 S.Ct. at 1590–91. The Court therefore concluded that injunctive relief in such circumstances was essential to the enforcement of the parties' agreement to arbitrate contract disputes. The Court cautioned, however, that injunctions against strikes should not issue routinely, but would

---

**5.** A temporary restraining order was denied by the district court on February 20, 1981.

**6.** The district court also required the Union to post a $15,000 bond.

**7.** Section 301(a), 29 U.S.C. § 185(a) (1976), provides:

Suits for violation of contracts between an employer and a labor organization represent-

ing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

be appropriate only when the collective bargaining agreement called for mandatory arbitration and when certain equitable preconditions were satisfied:

> When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance.

398 U.S. at 254, 90 S.Ct. at 1594 (quoting *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 228, 82 S.Ct. 1328, 1346, 8 L.Ed.2d 440 (1962) (Brennan, J., dissenting)).

The scope of the so-called *Boys Markets* exception to the Norris-LaGuardia Act was narrowed by the Supreme Court's subsequent decision in *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). In this case, the employer sought an injunction to restrain the union from engaging in a sympathy strike that the employer alleged was in violation of the labor agreement's no-strike clause. The Court held that under these circumstances an injunction would be improper because the dispute underlying the strike—union support for striking sister unions negotiating with the employer—was not "even remotely subject to the arbitration provisions of the contract." 428 U.S. at 407, 96 S.Ct. at 3147. Where the underlying dispute is not arbitrable, the Court

concluded, a strike over that dispute could not constitute an evasion of the duty to arbitrate, and hence a *Boys Markets* injunction was unnecessary to enforce the promise to submit contract disputes to arbitration.

The Supreme Court's reasoning in *Buffalo Forge* demands our closest scrutiny because numerous courts have found that its treatment of injunctions against strikes is equally applicable to the question of injunctions against employer breaches of collective bargaining agreements.[8] *Columbia Local, American Postal Workers Union v. Bolger*, 621 F.2d 615, 617 (4th Cir. 1980); *United Steelworkers v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1278 (3d Cir. 1979); *Lever Brothers Co. v. International Chemical Workers Local 217*, 554 F.2d 115, 123 (4th Cir. 1976); *Columbia Typographical Union No. 101 v. Evening Star Newspaper Co.*, 100 L.R.R.M. 2394, 2395 (D.D.C.1978); *Teamsters Local 764 v. Branch Motor Express Co.*, 463 F.Supp. 282, 287 (M.D.Pa. 1978). We agree with these cases and therefore conclude that the rule respecting injunctions in aid of arbitration is a "two-sided coin." *Lever Brothers*, 554 F.2d at 123.

The Court in its opinion in *Buffalo Forge* first cited the general principle that the *quid pro quo* for the employer's promise to arbitrate contract disputes lay in the undertaking by the union not to strike over issues that were subject to the arbitration machinery. Such a no-strike obligation could be expressly assumed by means of a no-strike clause in the labor agreement, as in *Boys Markets* and *Buffalo Forge*, or it could be implied from the existence of a broad arbitration clause, *Gateway Coal Co. v. UMW*, 414 U.S. 368, 381–82, 94 S.Ct. 629, 638–39, 38 L.Ed.2d 583 (1974); *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 105–06, 82 S.Ct. 571, 577–78, 7 L.Ed.2d 593 (1962). In both situations, the Court implied, the limit of the no-strike obligation was a promise

---

**8.** The Supreme Court invited this application when it vacated and remanded for consideration in light of *Buffalo Forge* a Ninth Circuit decision involving an injunction against an employer. *Transit Union Division 1384 v. Greyhound Lines, Inc.*, 529 F.2d 1073 (9th Cir.), *vacated and remanded*, 429 U.S. 807, 97 S.Ct. 93, 50 L.Ed.2d 68 (1976), *reversed*, 550 F.2d 1237 (9th Cir.), *cert. denied*, 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977).

not to strike over arbitrable disputes. Where, as in *Boys Markets*, the strike is called in response to an arbitrable dispute, the strike constitutes a direct evasion of the promise to arbitrate. In *Buffalo Forge*, in contrast, because the underlying dispute was not arbitrable, the *quid pro quo* for the no-strike duty was absent and the strike could not possibly vitiate arbitration: "The strike had neither the purpose nor the effect of denying or evading an obligation to arbitrate or of depriving the employer of its bargain." 428 U.S. at 408, 96 S.Ct. at 3148.

Second, the Court in *Buffalo Forge* held that an injunction was not authorized merely because the sympathy strike itself, in contrast to the underlying dispute, was alleged to be a violation of the collective bargaining agreement (specifically, its no-strike clause). This was true even though the claim of a contract breach was itself subject to arbitration. To grant an injunction against the sympathy strike, the Court reasoned, would permit an injunction to issue in every case in which a breach of contract is alleged, even when an injunction is not necessary to enforce the promise to arbitrate. In language seemingly directed to employer breaches of contract as well as to union breaches, the Court stated:

> If an injunction could issue against the strike in this case, so in proper circumstances could a court enjoin any other alleged breach of contract pending the exhaustion of the applicable grievance and arbitration provisions even though the injunction would otherwise violate one of the express prohibitions of § 4 [of the Norris-LaGuardia Act]. The court in such cases would be permitted, if the dispute was arbitrable, to hold hearings, make findings of fact, interpret the applicable provisions of the contract and issue injunctions so as to restore the status quo, or to otherwise regulate the relationship of the parties pending exhaustion of the arbitration process. This would cut deeply into the policy of the Norris-LaGuardia Act and make the courts potential participants in a wide range of arbitrable disputes under the many existing and future collective bargaining con-

tracts, not just for the purpose of enforcing promises to arbitrate, which was the limit of *Boys Markets*, but for the purpose of preliminarily dealing with the merits of the factual and legal issues that are subjects for the arbitrator and of issuing injunctions that would otherwise be forbidden by the Norris-LaGuardia Act.

428 U.S. at 410–11, 96 S.Ct. at 3148–49 (footnotes omitted). The issuance of such status quo injunctions, the Court indicated, would not only contravene the Norris-LaGuardia Act's prohibition of judicial interference in labor disputes but would in addition deprive the parties of their bargain. That bargain was to submit contract disputes to the decision of an arbitrator, a decision that the Court viewed as being preempted when a contract dispute is resolved by means of a preliminary injunction. Thus, *Buffalo Forge* restricted *Boys Markets* injunctions to situations in which injunctive relief is necessary to enforce the parties' agreement to arbitrate.

Although a few courts have construed *Buffalo Forge* to preclude virtually all status quo injunctions against employers, *UMW District 2 v. Rochester & Pittsburgh Coal Co.*, 416 F.Supp. 74 (W.D.Pa.1976), it is well-established that federal courts after *Buffalo Forge* retain the authority, in aid of arbitration, to enjoin employer actions. *See, e.g., Columbia Local, American Postal Workers Union v. Bolger*, 621 F.2d 615 (4th Cir. 1980); *United Steelworkers v. Fort Pitt Steel Casting*, 598 F.2d 1273 (3d Cir. 1979); *Teamsters Local 71 v. Akers Motor Lines, Inc.*, 582 F.2d 1336 (4th Cir. 1978), *cert. denied*, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979); *Lever Brothers Co. v. International Chemical Workers Local 217*, 554 F.2d 115 (4th Cir. 1976); *Teamsters Local 961 v. Graves Truck Line, Inc.*, 502 F.Supp. 1292 (D.Colo.1980); *Bakery Drivers Local 802 v. S.B. Thomas, Inc.*, 99 L.R.R.M. 2253 (E.D.N.Y.1978); *Teamsters Local 764 v. Branch Motor Express Co.*, 463 F.Supp. 282 (M.D.Pa.1978); *Columbia Typographical Union No. 101 v. Evening Star Newspaper Co.*, 100 L.R.R.M. 2394 (D.D.C.1978); *Na-*

*tional Post Office Mail Handlers v. U. S. Postal Service*, 103 L.R.R.M. 3107 (D.Neb. 1978); *Texaco Independent Union v. Texaco, Inc.*, 452 F.Supp. 1097 (W.D.Pa.1978). Despite the consistency of results in these cases, the analysis employed by the courts has taken various courses. Two leading cases illustrate the divergent approaches.

In *Transit Union Division 1384 v. Greyhound Lines, Inc.*, 529 F.2d 1073 (9th Cir.), *vacated and remanded*, 429 U.S. 807, 97 S.Ct. 93, 50 L.Ed.2d 68 (1976), *reversed*, 550 F.2d 1237 (9th Cir.), *cert. denied*, 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977), the Ninth Circuit upheld an injunction that prohibited an employer, pending arbitration, from implementing changes in work schedules. Following its decision in *Buffalo Forge*, the Supreme Court vacated the judgment and remanded for further consideration. On remand, the Ninth Circuit reversed its earlier ruling and held that no injunction could issue against an employer absent an express or implied duty by the employer to preserve the status quo pending arbitration. The court analogized an employer's duty to maintain the status quo pending arbitration to a union's obligation not to strike over arbitrable grievances. It concluded that the employer had not expressly agreed to preserve the status quo, nor was there a basis for finding such an obligation implied in fact. Although a broad arbitration clause might form the basis for an implied duty by the *union* not to strike, the same arbitration clause would generally not imply a duty on the part of the *employer* to maintain the status quo pending arbitration. The reason for this difference, the court suggested, was that generally a strike will frustrate and interfere with the arbitral process while generally employer action will not. Therefore, there will *ordinarily* be no occasion to imply a status quo obligation in the context of employer contract breaches. 550 F.2d at 1238–39. In any event, the Ninth Circuit observed, the employer's action in *Greyhound* could not frustrate arbitration because the arbitrator was in a position to restore substantially the status quo ante in the event that the work schedule changes

were found to be in violation of the labor contract.

The "status quo" approach of *Greyhound* has the merit of emphasizing the parties' intended forum or remedies for the resolution of contract disputes. As such, the approach is consistent with the concern expressed in *Buffalo Forge* that the parties be given the benefit of their bargain and that a contractually assumed arbitral remedy not be supplanted by injunctive relief. A few courts have been persuaded by the *Greyhound* analysis. *United Steelworkers v. Fort Pitt Steel Casting*, 598 F.2d 1273 (3d Cir. 1979); *Texaco Independent Union v. Texaco, Inc.*, 452 F.Supp. 1097 (W.D.Pa. 1978). The approach breaks down, however, once it is conceded that a duty to preserve the status quo pending arbitration may be *implied* in order to prevent frustration of the arbitral process. For then the search for an express obligation—actively undertaken—to preserve the status quo is superfluous, and the propriety of a status quo injunction comes to depend on whether the employer action sought to be enjoined will in fact frustrate the arbitral process. *See* Cantor, *Buffalo Forge and Injunctions Against Employer Breaches of Collective Bargaining Agreements*, 1980 Wis.L.Rev. 247, 268–74.

A more straightforward approach, and one that ultimately is not inconsistent with the *Greyhound* analysis, was employed by the Fourth Circuit in *Lever Brothers Co. v. International Chemical Workers Local 217*, 554 F.2d 115 (4th Cir. 1976). This approach dispenses with the search for an express promise by the employer to maintain the status quo pending arbitration and instead inquires directly whether the employer's action frustrates the arbitral process or deprives the union of an otherwise effective arbitral remedy. In *Lever Brothers*, the court affirmed an injunction that restrained an employer, pending arbitration, from relocating its plant facility. The court concluded that to deny the injunction and permit the employer to complete the transfer before an arbitrator could decide the union's grievance would present the arbitrator

with a "fait accompli" and deprive the union of an effective remedy in the event the arbitrator decided the grievance in the union's favor. The *Lever Brothers* approach has been followed by most courts. *See, e.g., Columbia Local, American Postal Workers Union v. Bolger*, 621 F.2d 615 (4th Cir. 1980); *Teamsters Local 71 v. Akers Motor Lines, Inc.*, 582 F.2d 1336 (4th Cir. 1978), *cert. denied*, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979); *Teamsters Local 764 v. Branch Motor Express Co.*, 463 F.Supp. 282 (M.D.Pa.1978); *National Post Office Mail Handlers v. U. S. Postal Service*, 103 L.R.R.M. 3107 (D.Neb.1978).

■ We find the *Lever Brothers* "frustration of arbitration" analysis to be persuasive and adopt it as the standard governing the instant case. We therefore hold that *Buffalo Forge* does not preclude the issuance of *Boys Markets* injunctions against employer breaches of collective bargaining agreements. Such relief is available, in aid of arbitration, where the underlying dispute is subject to mandatory arbitration under the labor contract and where an injunction is necessary to prevent arbitration from being rendered a meaningless ritual. As in all *Boys Markets* situations, the court must be satisfied that traditional requirements of equity—irreparable injury, a balance of hardships, and, *to an appropriate degree*, probability of success on the merits—support the award of injunctive relief. When these preconditions have been satisfied, we believe that a status quo injunction serves the salutary purpose of enforcing the parties' agreement to arbitrate by preserving an effective arbitral remedy for bargaining agreement breaches. We turn now to consider whether the necessary conditions of injunctive relief are present here.

## A.  Arbitrability

At the outset we must ascertain whether the contract dispute in the instant case is arbitrable. In *Lever Brothers*, 534 F.2d at 119, the court determined arbitrability by employing the familiar presumption of arbitrability adopted by the Supreme Court in cases involving orders to compel arbitration:

> An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

*United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960). In extending this presumption to cases involving injunctions against threatened contract breaches, the *Lever Brothers* court was guided by the Supreme Court's repeated admonition that courts not become involved in interpreting labor agreements which provide for arbitration.[9]

This approach of importing uncritically the presumption of arbitrability developed for use in the context of orders to compel arbitration has been criticized by several commentators. Cantor, *Buffalo Forge and Injunctions Against Employer Breaches of Collective Bargaining Agreements*, 1980 Wis.L.Rev. 247, 275–78; Payne, *Enjoining Employers Pending Arbitration—From M–K–T to Greyhound and Beyond*, 3 Ind.Rel.

9. The Supreme Court's own pronouncements on the extension of the presumption of arbitrability to *Boys Markets* cases have been somewhat ambiguous. In *Boys Markets* the Court indicated that an injunction could be granted only when the contract in fact had the effect of requiring the parties to submit the particular dispute to arbitration. *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 254, 90 S.Ct. 1583, 1594, 26 L.Ed.2d 199 (1970). In *Gateway Coal Co. v. UMW*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), the Court appeared to invoke the presumption of arbitrability in a *Boys Markets* context. But in *Buffa-*

lo Forge Co. v. United Steelworkers, 428 U.S. 397, 408 n.10, 96 S.Ct. 3141, 3148 n.10, 49 L.Ed.2d 1022 (1976), the Court reiterated the function of the district court in *Boys Markets* cases to determine arbitrability, and interpreted the *Gateway Coal* decision as having "finally" concluded that the dispute in question was arbitrable. Thus, it is unclear from these decisions what degree of scrutiny a court should give to the arbitration clause and its application to the particular dispute in determining arbitrability for the purpose of issuing a *Boys Markets* injunction.

L.J. 169, 196–97 (1979); Comment, *Boys Markets Injunctions Against Employers*, 91 Harv.L.Rev. 715 (1978). These commentators argue that *Boys Markets* injunctions, unlike orders to compel arbitration, often dramatically alter the relative bargaining power of employers and unions by preventing one of the parties from pursuing a course of action that it claims is sanctioned under the labor contract. The use of the presumption of arbitrability in *Boys Markets* cases, they maintain, results in an unacceptable risk that injunctions will be issued erroneously in cases in which the underlying dispute is outside the scope of the arbitration provision. This risk is particularly great in situations involving contracts that contain a "management prerogatives" clause, which typically excludes from arbitration broadly defined areas of exclusive management responsibility. Blind application of the presumption of arbitrability in such cases, some commentators conclude, could easily cause significant and unintended encroachment on management prerogatives.

We need not explore further this puzzling question, however, because Panoramic has throughout these proceedings conceded the arbitrability of the "successors" clause dispute. We thus express no opinion on whether the presumption of arbitrability should be applied in determining arbitrability for the purpose of granting a *Boys Markets* injunction.[10]

### B. Likelihood of Success on the Merits

Panoramic contends that the district court erred both in neglecting to require the Union to establish a likelihood of pre-

vailing on the merits of the arbitrable dispute and in improperly prejudging the merits of that dispute. Wholly apart from the contradictory nature of these contentions, we find neither to be persuasive.

Panoramic relies on *Hoh v. Pepsico, Inc.*, 491 F.2d 556, 561 (2d Cir. 1974) for the proposition that a union seeking a status quo injunction against employer action must show "not simply some likelihood of success in compelling arbitration but in obtaining the award in aid of which the injunction is sought." *See also Columbia Typographical Union No. 101 v. Evening Star Newspaper Co.*, 100 L.R.R.M. 2394 (D.D.C. 1978); *Bakery Drivers Local 802 v. S.B. Thomas, Inc.*, 99 L.R.R.M. 2253 (E.D.N.Y. 1978); *Communication Workers v. Western Electric Co.*, 430 F.Supp. 969 (S.D.N.Y. 1977); *United Steelworkers v. Blaw-Knox Foundry & Mill Machinery, Inc.*, 319 F.Supp. 636 (W.D.Pa.1970). We decline to follow these cases. The *Hoh* decision has been considerably eroded in subsequent cases from the Second Circuit.[11] More importantly, a requirement that the plaintiff show a likelihood of prevailing on the merits of its grievance would intrude significantly on the arbitrator's function and would constitute the sort of judicial preemption of the arbitral process condemned in *Buffalo Forge*. Consequently, we join with the Fourth and Ninth Circuits in adopting the following standard:

[A] plaintiff, without regard to whether he is the employer or the union, seeking to maintain the status quo pending arbitration pursuant to the principles of *Boys Markets* need only establish that the position he will espouse in arbitration is suffi-

**10.** Our treatment of this issue leaves intact the decisions of this court that have discussed the presumption of arbitrability in the context of *Boys Markets* injunctions. *See NLRB v. Keller-Crescent Co.*, 538 F.2d 1291 (7th Cir. 1976).

**11.** In *Wine, Liquor and Distillery Workers Local 1 v. Hiram Walker–W.A. Taylor Distributors, Inc.*, 88 L.R.R.M. 3117, 3131 (S.D.N.Y.), *aff'd*, 90 L.R.R.M. 2889 (2d Cir. 1975), the court interpreted *Hoh* to require only that the plaintiff raise "serious, substantial questions going to the merits, to render such issues a fair subject for litigation." This less exacting standard

for assessing the merits was reaffirmed by the Second Circuit in *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 443 (2d Cir. 1977), in which the court held that a showing of probable success on the merits was necessary only when the plaintiff fails to establish either a threat of irreparable harm or a balance of hardships in his favor. Thus, the *Hoh* decision has not been construed to make a showing of a likelihood of prevailing on the merits of the arbitrable dispute an absolute prerequisite to the issuance of an injunction.

ciently sound to prevent the arbitration from being a futile endeavor. If there is a genuine dispute with respect to an arbitrable issue, the barrier [to the issuance of an injunction] we believe appropriate[ly sic] has been cleared.

*Transit Union Division 1384 v. Greyhound Lines, Inc.*, 529 F.2d 1073, 1077–78 (9th Cir.), *vacated and remanded*, 429 U.S. 807, 97 S.Ct. 93, 50 L.Ed.2d 68 (1976), *reversed*, 550 F.2d 1237 (9th Cir.), *cert. denied*, 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977). *See also Teamsters Local 71 v. Akers Motor Lines, Inc.*, 582 F.2d 1336, 1342 (4th Cir. 1978), *cert. denied*, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979); *Lever Brothers Co. v. International Chemical Workers Local 217*, 554 F.2d 115, 120 (4th Cir. 1976).

We conclude that the Union's claim that the proposed sale of the Sintered Specialties Division violates the "successors" clause of the collective bargaining agreement raises a sufficiently "genuine" dispute to support a status quo injunction. We decline Panoramic's invitation to parse the language of the "successors" clause, which Panoramic contends cannot support the Union's interpretation. Contract interpretation is the function of the arbitrator not the courts. It is sufficient for us to observe that the Union's position, having been the subject of numerous arbitration decisions construing other labor contracts, is not frivolous. *See, e.g., Sexton's Steakhouse, Inc.*, 76 Lab.Arb. 574 (1981) (Ross, Arb.); *Schneier's Finer Foods, Inc.*, 72 Lab.Arb. 881 (1979) (Belkin, Arb.); *High Point Sprinkler Co.*, 67 Lab. Arb. 239 (1976) (Connolly, Arb.); *National Tea Co.*, (unreported) (1973) (Teple, Arb.); *National Tea Co.*, 59 Lab.Arb. 1193 (1972) (Joseph, Arb.). We cannot conclude that arbitration of the dispute would be a "futile endeavor."

Nor are we convinced by Panoramic's argument that the district judge, in granting the preliminary injunction, improperly prejudged the merits of the arbitrable dispute, leaving nothing for the arbitrator to decide.

The district judge assiduously avoided any consideration of the merits of the "successors" clause issue. Her inquiry quite properly was confined to the question whether Panoramic's action would frustrate the arbitral process and whether the equitable principles of irreparable injury and a balance of hardships supported an award of relief. This inquiry did not amount to a judicial preview of the arbitrable issue, and did not, therefore, fall within the strictures of *Buffalo Forge*. As the Court has itself recognized in a similar case under the Railway Labor Act, an examination of the arbitrable dispute to determine whether irreparable injury is threatened and whether a balance of hardships favors the issuance of an injunction is very different from the examination subsequently to be made by an arbitrator. *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad*, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1435 (1960). Panoramic's argument, if accepted, would in essence prevent the issuance of a *Boys Markets* injunction in virtually every case, a result that is certainly at odds with the general reaffirmation of approval for such injunctions in *Buffalo Forge*. Moreover, we emphasize that the type of injunction issued in the instant case not only does not interfere with the arbitrator's function, but, in fact, honors and protects the arbitrator's jurisdiction by preserving an effective arbitral remedy for the alleged breach of contract.

## C. Irreparable Injury

■ The Supreme Court in *Boys Markets* established that the existence of actual or threatened irreparable injury is a prerequisite to an award of injunctive relief from breaches of collective bargaining agreements. 398 U.S. at 254, 90 S.Ct. at 1594. Irreparable injury means not simply any injury resulting from a breach of contract that would not be fully redressed by an arbitral award,[12] but rather "injury so ir-

---

12. While awaiting a decision by the arbitrator on his grievance, an employee frequently suffers some injury that is not compensated by the contract remedies (in contrast to tort damages) typically awarded in arbitration. *See* Payne, *Enjoining Employers Pending Arbitration—From M–K–T to Greyhound and Beyond*, 3 Ind. Rel.L.J. 169, 198–200 (1979). Although such

reparable that a decision of the [arbitration] Board in the union['s] favor would be but an empty victory," *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad,* 363 U.S. 528, 534, 80 S.Ct. 1326 at 1330, 4 L.Ed.2d 1435 (1960). Thus, we follow what we understand to be the practice of most courts and focus into a single concept the twin ideas of irreparable injury and frustration of arbitration. An injunction in aid of arbitration is appropriate, therefore, only when the actual or threatened harm to the aggrieved party amounts to a frustration or vitiation of arbitration.

We believe that Panoramic's sale of the Sintered Specialties Division, were it not for the preliminary injunction issued by the district court, would have resulted in a frustration of the arbitral process and would have threatened irreparable injury to the Union and its members. Consummation of the sale before an arbitrator had an opportunity to rule on the Union's contention that the sale violated the labor agreement would have presented the arbitrator with a fait accompli, leaving him without any real power to award an adequate remedy in the event that the Union's claim was sustained. This conclusion finds support in a wide range of cases holding that similar employer actions threatened irreparable injury or resulted in a frustration of arbitration. *Teamsters Local 71 v. Akers Motor Lines, Inc.,* 582 F.2d 1336 (4th Cir. 1978), *cert. denied,* 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979) (partial liquidation of business); *Lever Brothers Co. v. International Chemical Workers Local 217,* 554 F.2d 115 (4th Cir. 1976) (relocation of plant); *Bakery Drivers Local 802 v. S.B. Thomas, Inc.,* 99 L.R.R.M. 2253 (E.D.N.Y. 1978) (subcontracting of union work); *Columbia Typographical Union No. 101 v. Evening Star Newspaper Co.,* 100 L.R.R.M. 2394 (D.D.C.1978) (termination of business); *Food Employees Local 590 v. National Tea*

*Co.,* 346 F.Supp. 875 (W.D.Pa.), *remanded without opinion,* 474 F.2d 1338 (3d Cir. 1972) (sale of business); *Technical, Office & Professional Workers Local 757 v. Budd Co.,* 345 F.Supp. 42 (E.D.Pa.1972) (relocation of corporate headquarters).

■ Panoramic attempts to avoid this conclusion by suggesting that any breach of contract it may have committed could be adequately redressed by an award of monetary compensation. The Union concedes, and we agree, that such a damage remedy would be available to the Union in the pending arbitration proceeding. We do not agree, however, that this remedy would be adequate. The proposed sale of the Sintered Specialties Division would have resulted in the immediate loss of employment by 113 Panoramic workers represented by the Union. The purchaser, SSI, has no duty to rehire these employees and has expressed no specific desire to do so. Where, as here, employer action threatens a permanent loss of jobs, a damage remedy is inadequate. *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad,* 363 U.S. 528, 534, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1435 (1960); *Teamsters Local 71 v. Akers Motor Lines, Inc.,* 582 F.2d 1336, 1341 (4th Cir. 1978), *cert. denied,* 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979); *Bakery Drivers Local 802 v. S.B. Thomas, Inc.,* 99 L.R.R.M. 2253, 2257 (E.D.N.Y.1978); *Columbia Typographical Union No. 101 v. Evening Star Newspaper Co.,* 100 L.R.R.M. 2394, 2396 (D.D.C.1978); *Food Employees Local 590 v. National Tea Co.,* 346 F.Supp. 875, 882–83 (W.D.Pa.), *remanded without opinion,* 474 F.2d 1338 (3d Cir. 1972).[13]

Reinstatement, the traditional remedy for employee discharges in violation of the labor contract, is the only form of relief that would be adequate to prevent irreparable injury to the Union in the instant case.

---

injury is, in this sense, irreparable, it has never been understood to form the basis for injunctive relief against the employer.

**13.** The prospect of a permanent loss of jobs distinguishes the instant case from *Chicago Typographical Union No. 16 v. Chicago Newspa-*

*per Publishers' Ass'n,* 620 F.2d 602 (7th Cir. 1980). In that case, we held that loss of monetary compensation and vacation benefits did not constitute irreparable injury sufficient to support a status quo injunction against the employer.

Panoramic insists that a status quo injunction was not necessary to preserve reinstatement as an available remedy. It argues that a reinstatement order could have been obtained against either Panoramic or SSI.

With respect to the pending arbitration proceeding between Panoramic and the Union, Panoramic suggests that the arbitrator, even without the benefit of the preliminary injunction that has been entered, could, after finding for the Union, have ordered Panoramic to undo or rescind the completed sale and offer reinstatement to the terminated employees. We are much less confident than Panoramic that an arbitrator possesses the authority to order a rescission of such a contract of sale after it has been consummated. Even if such authority existed, an arbitrator would likely be extremely reluctant to enter a rescission order given the practical difficulties of implementing it. At oral argument, counsel for Panoramic admitted that this opportunity for an eventual reinstatement of the employees with Panoramic was, at best, impracticable, and we agree. We are thus unwilling to find that this pursuit of arbitration with Panoramic *after* the sale is adequate to protect the interest of the Panoramic employees in their jobs at the Sintered Specialties Division.

Panoramic maintains that a reinstatement remedy is also available against the proposed purchaser of the Sintered Specialties Division, SSI. It observes that the Union could seek a court order to compel SSI to arbitrate with the Union concerning the extent to which SSI is bound by the presently existing collective bargaining agreement. We believe that this recourse against the purchaser is speculative and, therefore, inadequate to prevent irreparable injury to the Union.

The duty of a purchaser to arbitrate with the union the question of which contract terms survive the sale of assets is primarily a function of whether there has been a "substantial continuity of identity" in the work force before and after the completion of the sale. *Howard Johnson Co. v. Detroit Local Joint Executive Board, Hotel & Restaurant Employees,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).[14] A purchaser of corporate assets is under no duty to hire all, or even some, of the employees of the selling company provided that its hiring decisions do not discriminate on the basis of union membership. *Howard Johnson,* 417 U.S. at 262, 94 S.Ct. at 2243. In the instant case, SSI has asserted its right not to hire all of the former Panoramic employees and has solicited job applications from the general public. Hence, there is serious doubt whether there will be a "substantial continuity of identity" in the Sintered Specialties Division work force following completion of the sale to SSI. The Union's ability to obtain an order compelling SSI to arbitrate the "successors" clause issue is, therefore, only a possibility and depends in large measure on factors entirely within SSI's control.

Panoramic contends, however, that the speculative nature of the arbitral remedy against SSI threatens no irreparable injury to the Union because a court, in deciding whether SSI must arbitrate with the Union under § 301(a), 29 U.S.C. § 185(a) (1976), would also effectively dispose of the merits of the "successors" clause question. The purchaser, Panoramic reasons, would be under an obligation to arbitrate the contract dispute only if it is found to be a successor under the "continuity" test set forth in *Wiley* and *Howard Johnson.* If SSI is not a successor under this test, however, the inability of the Union to compel arbitration

14. A substantial continuity of identity of the work force is also the primary factor considered by the National Labor Relations Board ("Board") in determining whether a purchaser of a business is under a duty to bargain with the union that represents the predecessor company's employees. *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); *Saks & Co. v. NLRB,* 634 F.2d 681 (2d Cir. 1980); *Southwestern Broadcasters, Inc.,* 255 NLRB No. 53 (1981); *Stewart Granite Enterprises,* 255 NLRB No. 91 (1981).

with SSI inflicts no harm on the Union because the court's determination that SSI is not a "successor" for purposes of compelling arbitration is equivalent to a finding that SSI is not a "successor" under the terms of the labor contract. Therefore, Panoramic argues, even if the Union fails in its effort to secure an arbitration with the purchaser, it will suffer no irreparable injury for the simple reason that it has no valid claim for breach of contract.

Implicit in Panoramic's argument is the assumption that the term, "successors," used in the collective bargaining agreement is identical in meaning and definition to the same term as it is used by the Board and by courts in defining a purchaser's duty to arbitrate and to bargain with the union that represents the predecessor's employees. We are unable to join Panoramic in making this assumption since we believe that the meaning of the term, "successors," in the labor contract is a question of contract interpretation to be decided by an arbitrator and not by the courts. It is sufficient for us to observe that an arbitrator could, not unreasonably, construe the "successors" clause in the labor contract to impose obligations on purchasers who might not qualify as "successors" under the Board- and court-imposed "continuity" test. If Panoramic's conclusions about the identity of meaning of the term, "successors," is incorrect, the Union could indeed have a meritorious claim for breach of the "successors" clause, yet no recourse against SSI in an arbitration proceeding. For this reason, we conclude that an arbitral remedy against SSI for the alleged breach of contract is speculative and, therefore, inadequate.[15]

■ Having addressed Panoramic's arguments, we hold that the decision to sell the Sintered Specialties Division threatened the Union and its members with irreparable injury. Consummation of the sale would have left the arbitrator with no certain and effective means of remedying the breach of contract that the Union has alleged. An injunction to restrain Panoramic, pending arbitration, from completing the proposed sale was thus necessary to preserve a reinstatement remedy and to prevent frustration of the arbitral process.

D. Balance of Hardships

The final equitable prerequisite to the issuance of a status quo injunction is a finding that the union will suffer more from the denial of an injunction than will the employer from its issuance. As indicated, the proposed sale of the Sintered Specialties Division threatens 113 Panoramic employees with a permanent loss of employment, the only certain remedy for which is an award of damages that is not adequate to prevent irreparable injury. We agree with the district court that this showing of injury to the Union and its members outweighs whatever financial injury Panoramic will suffer in these circumstances as a result of the injunction.

Panoramic identifies two hardships that it has been forced to endure and insists that the district court abused its discretion in failing to conclude that these hardships outweighed the injury suffered by the Union. First, Panoramic points out, with some accuracy, that as a consequence of the injunction it may lose the opportunity to sell the Division to SSI. Panoramic is incorrect in concluding, however, that this missed opportunity represents a cash loss equal to the purchase price of $4,520,000 offered by SSI. This conclusion must seem to rest on the manifestly faulty premise that the assets in

15. We also reject Panoramic's assertion that the district court's refusal to enjoin the termination of the employees contradicts its finding of irreparable injury with respect to the sale of assets. After issuing the injunction against the sale, the district judge denied the Union's request to enjoin implementation of Panoramic's February 13, 1981, termination notice. The court indicated that the discharged employees could obtain adequate relief in an arbitration proceeding. This relief was adequate, however, only because of the injunction against the sale, since this was the device by which the remedy of reinstatement with Panoramic was preserved. Having enjoined the sale, it was simply unnecessary also to enjoin the discharges. Thus, the refusal to enjoin the discharges is in no sense inconsistent with the finding that an injunction against the sale was necessary to prevent irreparable injury.

question are valueless. To the contrary, Panoramic has never suggested that the Sintered Specialties Division is not a viable and profitable business enterprise. Its decision to sell the Division was motivated not by any financial imperative but rather by the incompatibility of the Division with Panoramic's other operations. The instant case is thus unlike the situation in *Local 1115, Joint Board Nursing Home & Hospital Employees v. B & K Investments, Inc.*, 436 F.Supp. 1203, 1209 (S.D.Fla.1977), in which the court denied (but subsequently granted) an injunction against the sale of a business on the ground that the loss of the proposed purchaser would force the seller out of business. Rather, the instant case more closely resembles *Bakery Drivers Local 802 v. S.B. Thomas, Inc.*, 99 L.R.R.M. 2253, 2258 (E.D. N.Y.1978), in which the court enjoined the subcontracting of union work, concluding that the employer's business remained financially profitable without the subcontracting and that the employer's proposed action was not compelled by economic necessity.

Second, Panoramic argues that the fact that it is being forced to continue operation of a plant that it wishes to sell is a hardship that ought to tip the scales against issuance of the injunction. We find little merit in Panoramic's complaint that the operating expenses incurred by it are unrecoverable, for there is no suggestion in the record that the Sintered Specialties Division is operating at a loss. In any event, the Supreme Court has noted that the relative hardships may favor issuance of an injunction even when the employer is compelled to maintain what may be a less efficient or more costly operation. *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad*, 363 U.S. 528, 534–35, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1435 (1960). Balanced against the very significant hardship that would be suffered by the Union had the injunction been denied, the asserted hardships suffered by Panoramic as a result of the injunction are not so great as to cause us to conclude that the district court abused its discretion in granting the injunction.

We are not unaware, however, that routine issuance of injunctions against the sale of businesses could in many cases be extremely disruptive and costly. Hence we emphasize the need for searching analysis of the facts and law peculiarly applicable to each case when confronted by a request for the sort of injunction sought here.

### III.

■ The instant action was filed with the district court on February 20, 1981. A copy of the Complaint, together with a copy of the Union's Motion for Preliminary Injunction and Temporary Restraining Order, was provided to counsel for Panoramic on February 22 during a meeting of the parties. Panoramic was advised at this meeting that a hearing on the Union's motion for a preliminary injunction had been scheduled for February 27, although the specific nature of this hearing was not known at that time. In a notice dated February 23, the district court informed the parties that due to severe demands on the court's time, no evidence would be received at the February 27 hearing. The notice stated, however, that the court would consider any affidavits and briefs submitted before 4:00 p. m. on February 26.[16] At the hearing on February 27, Panoramic was allowed to introduce documentary evidence as well as to present arguments in opposition to the motion for a preliminary injunction.

Panoramic now contends that these procedures utilized by the district court were fatally defective. Specifically, it argues that the court violated § 7 of the Norris-LaGuardia Act, which states in part that a federal court may not issue a temporary or permanent injunction in any case growing out of a labor dispute "except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint

16. Panoramic contends that it did not receive this notice from the district court until the afternoon of February 25, thus leaving it with insufficient time to prepare affidavits for submission before the prescribed deadline.

made under oath, and testimony in opposition thereto, if offered...." 29 U.S.C. § 107 (1976).

The courts have yet to resolve definitively whether, or to what extent, the *procedural* requirements of the Norris-LaGuardia Act are applicable in actions brought pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1976). The Supreme Court has indicated that § 7 does not apply in at least some cases involving labor injunctions. *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 457–59, 77 S.Ct. 912, 918–19, 1 L.Ed.2d 972 (1957). This court also has expressed doubt whether issuance of a *Boys Markets* injunction must always comply fully with the procedures specified in § 7. *Associated General Contractors v. Illinois Conference of Teamsters*, 486 F.2d 972, 975 n.8 (7th Cir. 1973). Nevertheless, numerous courts have observed that the equitable principles discussed in *Boys Markets* (irreparable injury, a balance of hardships, etc.) parallel the findings that a court must make under § 7. Therefore, these courts have concluded, § 7 is applicable in *Boys Markets* cases insofar as this section is consistent with the policies of § 301 enunciated in *Boys Markets.* In particular, the § 7 requirement of live testimony in open court (with an opportunity for cross-examination) has been held to be consistent with the policies of § 301. *Transit Union Division 1384 v. Greyhound Lines, Inc.*, 529 F.2d 1073, 1078 (9th Cir.), *vacated and remanded*, 429 U.S. 807, 87 S.Ct. 93, 50 L.Ed.2d 68 (1976), *reversed*, 550 F.2d 1237 (9th Cir.), *cert. denied*, 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977); *Celotex Corp. v. Oil, Chemical & Atomic Workers International Union*, 516 F.2d 242, 246–48 (3d Cir. 1975); *Hoh v. Pepsico, Inc.*, 491 F.2d 556, 560–61 (2d Cir. 1974); *United States Steel Corp. v. UMW*, 456 F.2d 483, 487–88 (3d Cir.), *cert. denied*, 408 U.S. 923, 92 S.Ct. 2492, 33 L.Ed.2d 334 (1972).

We agree that the requirement of a full evidentiary hearing is consistent with the policies of § 301 announced in *Boys Markets,* and that ordinarily the district court should hear testimony from witnesses in open court before granting a preliminary injunction in aid of arbitration. Nothing we say here should be understood to detract from this general requirement. We believe, however, that in the peculiar circumstances of the instant case, the failure of the district court to hear live testimony does not warrant reversal of its decision to grant a preliminary injunction against the proposed sale.

First, the facts upon which the relief was predicated were essentially undisputed. This was conceded by counsel for Panoramic at the commencement of the February 27 hearing. At that time, he told the district court that he understood the issues to be primarily legal in nature and that the only factual matters in dispute were minor. In addition, at no time during the hearing did Panoramic express disagreement with any of the statements contained in the Union's affidavits, nor did Panoramic make an offer of proof with respect to factual matters it believed were disputed. We also do not believe that the mere denial of the Union's allegations by Panoramic in its Answer served to raise a dispute of fact sufficient to necessitate, as a matter of law, the receipt of live testimony as a condition to a grant of a *Boys Markets* injunction.

Second, a paramount consideration in reviewing the district court's decision not to receive live testimony is that the court was presented with a situation in which time was of the essence. The Union filed its complaint on February 20, 1981 and a hearing was scheduled for February 27. A decision on the Union's motion had to be rendered before February 28, the day on which the sale of the Sintered Specialties Division was to be consummated and also the day on which 113 Panoramic employees were to be terminated from their jobs. Had the court delayed ruling on the motion in order to receive live testimony, all opportunity to grant the requested relief might have been foreclosed. We conclude that the district court, under these circumstances, was not wholly foreclosed from proceeding without live testimony. The district court was justified in making a decision at a time when it was still possible to grant effective relief,

especially when Panoramic had been allowed to present oral argument and documentary evidence, and when Panoramic had already represented to the court that there were no major issues of disputed fact.

We recognize that one court has held that the pressures of time on the district court provide no excuse for dispensing with testimony by witnesses on disputed issues, at least where the union could readily have avoided these time pressures by invoking arbitration at an earlier time. *Hoh v. Pepsico, Inc.*, 491 F.2d 556, 560–61 (2d Cir. 1974). In the instant case, as we have noted, however, there were few disputed facts. Moreover, the Union can in no sense bear responsibility for the time constraints facing the district court. Panoramic's decision to terminate its employees was not officially communicated to them until February 13, 1981. Within a few days, the Union had instituted a grievance and had commenced negotiations with both Panoramic and SSI over the effects of the proposed sale. On February 19, the Union learned for the first time that SSI had not agreed to assume the existing collective bargaining agreement. The Union's complaint was filed in the district court on the next day, February 20. Thus, the Union could not reasonably have obtained an arbitrator's decision on its claims before the February 28 closing date.

Finally, we note that Panoramic was offered, but it declined, an opportunity for a full evidentiary hearing. The district court, expressing a reluctance to issue a preliminary injunction without first hearing live testimony, offered to enter a temporary restraining order and to schedule a full hearing on the matter for March 3, 1981.[17] Counsel for Panoramic, expressing his intention to pursue an immediate appeal with this court, indicated a preference for a pre-liminary injunction. We note Panoramic's contention that both a preliminary injunction and a temporary restraining order would have had the effect of preventing the closing of the sale of the Division on February 28. Panoramic insists that in declining the court's offer it was simply attempting to resolve the controversy in the most expeditious manner available to it. Having elected this course of action, however, Panoramic cannot now be heard to complain that it was never afforded an opportunity for a full hearing.

IV.

For the foregoing reasons, the decision of the district court is affirmed.

Affirmed.

---

17. Panoramic argues that § 7 imposes requirements for the issuance of temporary restraining orders which are the same as those prescribed for preliminary injunctions, and, therefore, the district court's offer to enter a temporary restraining order on February 27 would also have violated § 7. We do not agree. Since § 7 expressly authorizes the issuance of temporary restraining orders ex parte and without notice, it is wrong to suggest that the statute requires the court to afford the defendant an opportunity to present live testimony. Whether issuance of a temporary restraining order requires live testimony by witnesses *in support of the motion* is a separate question that in no way implicates Panoramic's own right to present testimonial evidence.