INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WARE-HOUSEMEN AND HELPERS OF AMERICA, LOCAL UNION NO. 251, Plaintiff, Appellee,

v.

ALMAC'S, INC., d/b/a Rhode Island Produce Company, Defendant, Appellant.

No. 89–2091.

United States Court of Appeals, First Circuit.

Heard Dec. 5, 1989.

Decided Jan. 17, 1990.

Walter C. Hunter, with whom Edwards & Angell, Providence, R.I., was on brief for defendant, appellant.

Richard M. Peirce, with whom Roberts, Carroll, Feldstein & Tucker, Providence, R.I., was on brief for plaintiff, appellee.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and COFFIN, Senior Circuit Judge.

TORRUELLA, Circuit Judge.

Almac's Inc. (appellant) appeals from an order of the district court enjoining it from taking any steps to discontinue use of its own in-house distribution center or to contract with an unaffiliated grocery supplier, Wetterau, pending an arbitrator's ruling on a grievance filed by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 251's (appellee). For reasons stated below, we vacate the injunction.

Almac's is a supermarket chain operating in the Rhode Island area. On July 27, 1989, Almac's acquired all the assets of the Rhode Island Produce Company and agreed to assume the collective bargaining agreement (CBA) between the Company and the Union. This CBA runs until May 1991. Rhode Island Produce Company, now Almac's, operates a distribution center for all the produce and most of the other goods sold in Almac's stores. Buyers for Almac's purchase goods from a variety of sellers to stock this distribution center, from which point they are shipped to stores in the Almac's chain.

On October 5, 1989, Almac's gave notice to the Union that it intended to lay off employees, due to its pending termination of the distribution center. This notice complied with a federal notice statute under which Almac's could not lay off any employees or shut down the center until December 5, sixty days after the notice.[1] On this same date as the lay off notice, without any prior notice to the Union, Almac's entered into agreements with Wetterau. It agreed to make Wetterau a chief supplier

---

1. 29 U.S.C. §§ 2101–09.

of groceries to Almac's. It also agreed that Wetterau would purchase all of the assets of the distribution center, although Wetterau would not deliver from this center. Wetterau made it clear that it does not intend to abide by the CBA between Almac's and the Union. There would be a gradual switch to Wetterau, completed at about the same time Almac's obligation to pay the employees covered by the CBA expires.

The Union did not file a grievance within the five-day period mandated by the collective bargaining agreement. It did grieve, however, by letter on October 18, 1989. At that time, Almac's had already begun the transition to Wetterau. On November 3, 1989 at a preliminary injunction hearing, Almac's represented that it would not lay off employees before December 5, 1989. Almac's indicated that it had no intention of consummating the sale of the center to Wetterau until the arbitrator issued his decision. The Union opposes the use of Wetterau as a wholesaler and contends that the CBA binds "the parties hereto, their heirs, successors, administrators, executors and assignees." The language from the collective bargaining agreement at the core of its argument states:

> In the event an operation is sold, leased, transferred or taken over by sale, transfer, lease or assignment, ... such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof.

The Union also argues that Almac's actions violate the agreement not "to hire any outside truckers when it has available equipment of its own" and not "to hire any outside trucks except to supplement its own equipment when such equipment is in full use."

Almac's maintains that it has no obligation to condition the sale of the distribution center on Wetterau's acceptance of the CBA. Furthermore, Almac's argues that it initiated the grievance procedure as per the terms of the CBA and that it acted in accordance with Article XXIII of the agreement which provides "[w]hen the Company permanently closes a warehouse or permanently discontinues any department of a warehouse," terminated union members covered by the agreement are entitled to severance pay.

On November 6, 1989, the district court ordered a preliminary injunction. On November 20, 1989, the parties held their first hearing on the Union's grievance before an arbitrator. A second hearing was held on December 1. The arbitrator agreed to render a decision during the week of December 25, 1989.

## STANDARDS

█ Absent an abuse of discretion or mistake of law, the decision of the district court must stand. *Hibernia Savings Bank v. Ballarino*, 891 F.2d 370 at 372 (1st Cir.1989); *See, e.g., Crafts Precision Industries, Inc. v. Lodge No. 1836 of District 38, International Association of Machinists and Aerospace Workers*, 889 F.2d 1184 at 1185 (1st Cir.1989); *J.F. White Contracting Company v. Local 103 International Brotherhood of Electrical Workers*, 890 F.2d 528 at 529 (1st Cir.1989). In order to obtain an injunction, the Union must first show that its grievance is arbitrable. *Boys Markets Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 247–49, 90 S.Ct. 1583, 1590–91, 26 L.Ed.2d 199 (1976). Second, after such a showing, the Union must demonstrate the necessity of an injunction to preserve the arbitration. *Independent Oil & Chemical Workers of Quincy, Inc. v. Proctor & Gamble*, 864 F.2d 927, 932 (1st Cir.1988). Third, the Union must show that irreparable harm and imbalanced hardships would result without the injunction. *Id.* In the labor environment, the irreparable harm inquiry has come to focus on whether, without the injunction, the arbitration would become meaningless. *Lever Brothers Co. v. International Chemical Workers Union, Local 217*, 554 F.2d 115, 123 (4th Cir.1976).[2] If

---

**2.** "Irreparable injury does not mean simply any injury resulting from a breach of contract that would not be fully redressed by an arbitral award, but rather 'injury so irreparable that a decision of the [arbitration] Board in the union['s] favor would be but an empty victory.'" *Local Lodge No. 1266, International Association of Machinists and Aerospace Workers, AFL–CIO*

no such harm is shown, then the injunction cannot be upheld.

## DISCUSSION

■ Given the arbitration clause in the collective bargaining agreement and Almac's concession that the dispute is arbitrable, clearly the arbitrability threshold has been met. Thus, we move to the next part of our analysis: whether, without the injunction, arbitration would be meaningless and irreparable harm will result.

The district court enjoined Almac's from taking any steps to transfer its distribution operation to Wetterau and from laying off Local 251 members employed at the distribution center. The district court reasoned that the denial of a preliminary injunction would result in possible irreparable damage to the Union:

> ... Almac's will transfer the distribution operation to Wetterau, finishing the process in December. The arbitrator would therefore have to hear and decide the Union's grievance in less than a month. After December 5, Almac's implicitly admits that it will begin layoffs ..., endangering the jobs of 180 employees. The harm faced by the union is indeed serious and irrparable [sic]; a real possibility exists that the arbitrator's decision will not be handed down by December 5 and even if it is in favor of the union, will 'be but an empty victory.' *Panoramic Corp.*, 668 F.2d at 286 (quoting *Brotherhood of Locomotive Engineers v. Missouri–Kansas–Texas Railroad*, 363 U.S. 528 [, 80 S.Ct. 1326, 4 L.Ed.2d 1379] (1960)).... An order to reinstate the terminated employees and restart the warehouse operation would require Almac's to expend $15 million in purchasing new inventory and perhaps lead to an interruption in service to Almac's stores.... *The employees may have already found alternative employment.* [An injunction would] therefore preserve the options available to the arbitrator. (Emphasis supplied).

v. *Panoramic Corp.*, 668 F.2d 276, 285–86 (7th Cir.1981) (quoting *Brotherhood of Locomotive Engineers v. Missouri–Kansas–Texas Railroad*,

The issue before the arbitrator is whether Almac's sale of the distribution center to Wetterau violates the successors and assigns clause of the CBA. We now know that the arbitrator will not render a decision until the week of December 25, 1989, well after Almac's proposed shutdown was to have been complete. But, this hardly means that Union members are entitled to a preliminary injunction to rescue them from their own prophesied doom, nor that the district court, as purported saviour, was completely correct.

To qualify for a preliminary injunction, the Union must prove irreparable harm. Almac's has agreed to refrain from consummating the sale of the distribution center to Wetterau until an arbitrator rules on the Union's grievance. In the event that the arbitrator rules in the Union's favor, he can order reinstatement and backpay. Unlike *Lever Brothers and Local Lodge No. 1266 v. Panoramic*, 668 F.2d 276 (7th Cir. 1981), this is not a Humpty Dumpty situation. There, an injunction, issued on the day before the sale of a division, was upheld because consummation of the sale would result in the permanent loss of employment. The Seventh Circuit was not confident that "an arbitrator possesses the authority to order the rescission of such a contract of sale after it has been consummated." *Id.*

> Consummation of the sale before an arbitrator had an opportunity to rule on the Union's contention that the sale violated the labor agreement would have presented the arbitrator with a fait accompli, leaving him without any real power to award an adequate remedy in the event that the Union's claim was sustained.

*Panoramic*, 668 F.2d at 286. Furthermore, although the *Panoramic* court enjoined the consummation of the sale, it did not enjoin the termination of employees. Since terminations can be remedied through reinstatement at arbitration, that court reasoned that enjoining the discharges was unnecessary.

363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960)).

In the case at bar, all Almac's horses and all Almac's men *can* put the distribution center back into operation again. At the preliminary injunction hearing, Almac's President Segal testified that "[I]f I can start tomorrow and buy more merchandise, I can start in thirty days and buy more merchandise. The facility is there. All our equipment is there. We have not dismantled anything. We don't intend to dismantle anything." Clearly, Almac's can comply with an arbitrator's order to restock the distribution center.

As we said in *Independent Oil*, 864 F.2d at 930, "courts must not interfere unless the actions taken or threatened by one of the parties would render the outcome of any arbitration which would follow meaningless." Because Almac's has promised not to consummate the sale to Wetterau until after the arbitrator's decision, its action to discontinue distribution center operations is not irreversible. "Should [Almac's] be wrong in its position in arbitration the situation can be restored substantially to the status quo ante," *Amalgamated Transit Union Division 1384 v. Greyhound Lines, Inc.*, 550 F.2d 1237, 1239 (9th Cir.1977). through an arbitrator's award of reinstatement and back pay. Almac's still owns the property and has represented that distribution center operations can be returned to normal in three or four weeks.

For these reasons, we reverse the district court's order hindering Almac's transfer of its distribution operations to Wetterau and the termination of employees of the distribution center, because no irreparable injury such as to require the issuance of the injunction has been shown. Mandate shall issue forthwith.

*Reversed.*