**LOCAL 1115 JOINT BOARD NURSING HOME AND HOSPITAL EMPLOYEES, FLORIDA DIVISION, Petitioner,**

v.

**B & K INVESTMENTS, INC. d/b/a Krestview Nursing Home, Inc., a successor legal entity to Krestview Nursing Home, Inc., a Florida Corporation, Defendant/Respondent,**

**B & K Investments, Inc. d/b/a Townhouse Convalescent Center, Inc., a successor legal entity to Townhouse Convalescent Center, Inc., a Florida Corporation, Defendant/Respondent,**

**B & K Investments, Inc. d/b/a Pinecrest Convalescent Home, Inc., a successor legal entity to Pinecrest Convalescent Home, Inc., a Florida Corporation, Defendant/Respondent.**

No. 77–2210–Civ–SMA.

United States District Court,
S. D. Florida.

Aug. 17, 1977.

---

Allan M. Elster, Mamber, Gopman, Epstein & Foosaner, North Miami Beach, Fla., for petitioner.

Stephen J. Cabot, Philadelphia, Pa., R. Stuart Huff, Miami, Fla., for defendants/respondents.

## OPINION AND ORDER

ARONOVITZ, District Judge.

This matter came before the Court upon the Motion of the Petitioner, Local 1115 Joint Board Nursing Home and Hospital Employees, Florida Division, for Injunctive Relief and to Compel Arbitration pursuant to its Amended Petition for Injunctive Relief and Application to Compel Arbitration Under Title 9 U.S.C. Section 4. Jurisdiction of the Court is invoked under Title 29 U.S.C. Section 185 and Title 9 U.S.C. Section 4.[1]

---

1. Petitioner is a labor organization whose members are employees of an employer engaged in interstate commerce for the purpose of Title 29 U.S.C. Section 152 and Section 185.

Respondents, B & K Investments, Inc. d/b/a Krestview Nursing Home, Inc., a successor legal entity to Krestview Nursing Home, Inc., B & K Investments, Inc. d/b/a Townhouse Con-

The Court began an evidentiary hearing on Petitioner's Motion on August 3, 1977. The hearing was continued to August 12, 1977, and the introduction of exhibits and taking of testimony was thereafter completed on August 13, 1977, at which time the Court heard Oral Argument of counsel for the parties.

For the reasons which follow, Petitioner's Motion to Compel Arbitration will be GRANTED, and the Motion for Preliminary Injunction will be DENIED, subject to the conditions hereinafter set forth.

## FACTUAL BACKGROUND

Respondent, B & K Investments, Inc. ("B & K") is a Florida corporation controlled by Gerald D. Keller, and is currently doing business as the operator/lessee of three nursing homes in Dade County, Florida: Krestview Nursing Home, Inc. ("Krestview"); Townhouse Convalescent Center, Inc. ("Townhouse"); and Pinecrest Convalescent Home, Inc. ("Pinecrest"). In addition to controlling the stock of the three operating nursing home corporations, through B & K, Keller, through G & J Investment Corporation, owns the land, building and equipment of Krestview and Townhouse. The land, building and equipment of Pinecrest are owned by an unrelated third party, LKG Corporation.

Prior to May 5, 1977, pursuant to written leases with the respective property owners, the nursing homes were operated by Robert A. Wilson, as lessee through three nursing home corporations which he controlled.[2]

During the period of Wilson's operation of the nursing homes, he, on behalf of the subject corporations, entered into collective bargaining agreements with Petitioner, Local 1115 Joint Board Nursing Home and Hospital Employees, Florida Division ("Union").[3] According to the testimony adduced at the hearing, Wilson encountered severe financial difficulties with the nursing homes in April, 1977. He fell into default on his rental payments; numerous payroll checks of employees were returned for insufficient funds; and the quality of the care provided by the homes deteriorated to the extent that, according to testimony of an agent of the Florida Department of Health and Rehabilitative Services, that agency of the State of Florida was preparing legal action to close down the operations at the homes.

Faced with the potential loss of the nursing home licenses, as well as the problem of relocating the 500 patients at the facilities, Keller, through B & K, negotiated what can be termed an involuntary termination of Wilson's interests and took over the nursing homes from Wilson on May 5, 1977. The leases for Krestview and Townhouse were cancelled and the stock of those corporations transferred to B & K. Further, Pinecrest assigned its lease, and the stock was likewise transferred to B & K.

From May 5, 1977, and continuing up to the present, the homes have been operated by Keller's corporation, Respondent, B & K. The parties have stipulated that the operation of the homes under Keller's management is substantially the same as under Wilson and that substantially the same employees continued to be employed. This action was commenced on July 14, 1977, more than two months subsequent to the

---

valescent Center, Inc., a successor legal entity to Convalescent Center, Inc., and B & K Investments, Inc. d/b/a Pinecrest Convalescent Home, Inc., a successor legal entity to Pinecrest Convalescent Home, Inc., are employers engaged in commerce within the meaning of Title 29 U.S.C. Sections 152 and 185.

2. It is not entirely clear from the record when Wilson began operating the subject nursing homes. Wilson apparently took over Krestview in May, 1974 and Townhouse in August, 1975, as shown in the lease agreements for these two homes. (See Petitioner's Exhibits

# 33 and # 34). Wilson testified that at the same time the leases were entered into, he acquired the stock of the two nursing home operating corporations. With regard to Pinecrest, Wilson testified that he himself formed that corporation subsequent to the lease of that facility on December 31, 1974.

3. The agreements with Krestview, Townhouse and Pinecrest are dated July 13, 1974, January 19, 1976 and February 5, 1976, respectively, and each runs for a four-year term. (Petitioner's Exhibits # 6, # 9 and # 12).

termination of Wilson's interests in the homes.

In the period following Keller's acquisition, a number of meetings were held between management and the Union at which the question of the obligations of the new employer and the rights of the Union under the old ' collective bargaining agreements arose. The Union took the position that B & K, although not a party to the agreements made during Wilson's regime, was nevertheless bound by those agreements. Respondents, on the other hand, admitted that they were obliged to recognize the Union as the official bargaining entity but refused to be bound by contracts to which they were not a party and the obligations of which they had never explicitly agreed to assume. Moreover, Keller made it clear at those meetings that he had no desire to continue to run the nursing homes; rather, he intended to sell them as soon as possible.

At this juncture, the Union, acting upon the belief that a sale of the premises was imminent, sought a commitment from Respondents that they would honor Article 23 of the various agreements, which provides in part that "[t]his agreement shall be binding upon the parties, their successors and assigns," or alternatively, a commitment to arbitrate the matter. Having failed to obtain either of such commitments, the Union, on July 14, 1977, filed its verified Petition for Injunctive Relief and Application to Compel Arbitration Under Title 9 U.S.C. Section 4. At the same time, the Union moved for entry of a preliminary and permanent injunction to restrain Respondents from transferring in any way the subject homes without first complying with the successorship clauses quoted above i. e., requiring any purchaser to agree to assume the obligations of the collective bargaining agreements. Alternatively, the Union sought an order compelling Respondents to arbitrate pursuant to Articles 23 and 9 of the agreements the rights and duties of the parties under the successorship clauses, along with a similar injunction pending the arbitrator's decision and its enforcement, if necessary.

This case thus began as an attempt by the Union to prevent the transfer of the management operations of the homes unless the transferee would agree to assume the obligations of the existing collective bargaining agreements between the Union and the current operators. The Union argued that under the Supreme Court's decision in *Howard Johnson Company v. Detroit Local Joint Executive Board*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), a successor employer who did not agree to be bound by the terms of a pre-existing collective bargaining agreement could, by not employing a substantial number of the employees or otherwise changing the identity of the enterprise, be relieved of the duty to arbitrate under the predecessor's agreement. Consequently, the successor could cause the current employees irreparable harm—i. e., loss of jobs and the benefits of the collective bargaining agreement.

The original Petition named Krestview, Townhouse and Pinecrest—the Wilson corporations—as Respondents. Prior to the hearing, the Union filed an Amended Petition naming as Respondents B & K, doing business as the three nursing home corporations, and "a successor legal entity" to the Wilson corporations. What was not apparent from the Amended Petition, however, was the fact that the Union's collective bargaining agreements had been executed by the nursing home corporations when *Wilson* had controlled them. B & K—Keller's corporation—had never agreed to assume the obligations of these contracts. Thus the feared transfer had already occurred on May 5, 1977—the day that Keller took over from Wilson. These facts came out only on the first day of the hearing. The focus of the case then shifted to a two-step analysis of whether, first, B & K, as "successor" to Wilson's nursing home corporations, was either bound by the collective bargaining agreements or had a duty to arbitrate under them; and, secondly, whether an *injunction should issue*. It is to these two questions that the Court now turns.

## THE MERITS

### A. *The Motion to Compel Arbitration*

The Union contends that Respondents are bound by the collective bargaining agreements for three reasons: 1) Respondents as successors to the Wilson-owned corporations are in fact merely the "alter ego" of the predecessor corporations; 2) Respondents by their conduct have impliedly assumed the obligations of the agreements; and 3) Respondents, by retaining substantially all of the employees of the predecessor, are bound under the principles of *John Wiley & Sons v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) and *Howard Johnson Company, Inc. v. Detroit Local Joint Executive Board*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974).

Respondents, on the other hand, strenuously deny that they are alter egos of Wilson or that they have ever agreed to be bound by the agreements, expressly or impliedly. Moreover, they rely on *NLRB v. Burns International Security Service Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) for the proposition that a successor cannot be bound to its predecessor's collective bargaining agreement in the absence of an agreement so to do.

■ To begin with, the Court finds the Union's first argument to be without merit. The evidence presented at the hearing clearly demonstrated that the Wilson and Keller corporations were entirely separate entities. There is no evidence that Wilson's leases of the premises and his acquisition of the stock of the nursing home corporations were anything but bona fide, arms-length transactions. During the period of Wilson's operation of the homes, Keller had absolutely no involvement in the day to day administration or general management of the business nor any financial interest in the business operations. Indeed, Keller's eventual reacquisition of the homes, precipitated by Wilson's defaults, was essentially *involuntary* and more in the nature of an eviction. In the circumstances, the new management of the homes after May 5, 1977 was not the "alter ego" of the old.

■ Nor is the Court persuaded that Respondents by their actions impliedly agreed to be bound to the collective bargaining agreements. The testimony is in conflict as to whether Respondents told the Union at the various meetings that they would not agree to "assume the contracts" or whether they simply stated that they would not adhere to some of its provisions. Regardless of what was in fact said, the Court finds that Respondents were consistent in their position throughout the discussions that they were not operating under the collective bargaining agreements. Rather, relying upon their *"Burns* defense", Respondents sought at most to negotiate new collective bargaining agreements with the Union, while the latter held steadfastly to its view that Respondents were already bound by the old ones. Under the facts of this case, then, Respondents did not impliedly agree to assume the obligations of their predecessor's agreements.

To resolve the question of whether Respondents, by retaining virtually all of the employees of the former employer, are bound to the previous collective bargaining agreements, and/or to substantive terms thereof, the Court must first analyze the three Supreme Court cases above cited—*Wiley, Burns* and *Howard Johnson*.

*Wiley* held that where two corporations merge and the surviving corporation hires all of the prior employees and runs a substantially identical business, then that corporation is under a duty to arbitrate under the merged corporation's collective bargaining agreement.

*Burns* arose in the context of an unfair labor practice charge before the NLRB for failure of a "successor" to recognize and bargain with the Union and for refusing to honor the predecessor's collective bargaining agreement. The Court held that the NLRB was without authority to require Burns to honor a substantive provision of the agreement executed by its predecessor, Wackenhut, even though Burns had hired a majority of its employees from Wackenhut's previous employees. The policies stressed by the *Burns* Court were 1) free-

dom of contract under federal labor policy (as Burns had not expressly or impliedly agreed to assume the obligations of the predecessor's agreement); 2) inhibition of the free flow of capital if new employers were to be bound to pre-existing agreements; and 3) freedom of the successor to make substantial changes in the operation of the enterprise. Also significant was the fact that Burns had purchased nothing from Wackenhut; it was merely the low bidder on the contract for security services offered by Lockheed and was hired at the expiration of Wackenhut's contract.

The holding in *Howard Johnson* was narrowly confined to the facts therein: where Howard Johnson's had purchased a franchise from the Grissoms and had thereafter hired only 9 of 53 of the Grissoms' employees, and where it had expressly contracted *not* to assume the obligations of the Grissoms' agreement with the Union, then Howard Johnson's was not bound to arbitrate with the Union the rights of the employees not hired. In more general terms, the Court held that the new employer cannot be compelled to arbitrate obligations to the former employees of the old employer when there is "no substantial continuity of identity in the work force hired . . . and no express or implied assumption of the agreement to arbitrate." 417 U.S. at 264, 94 S.Ct. at 2244.

The Court in *Howard Johnson* explicitly declined to resolve the apparent conflict between *Wiley* and *Burns*. We are, therefore, guided by the decisions of the Fifth Circuit. In *United Steelworkers of America v. United States Gypsum Co. ("Gypsum II")*, 492 F.2d 713 (5th Cir. 1974), the Court distinguished between the power of the NLRB and that of an arbitrator to bind a successor to a prior existing collective bargaining agreement:

> "Reading the *Burns* opinion as a whole could justifiably leave one with the conviction that it presages a similar holding to the effect that an arbitrator, operating within the same basic framework of national labor policy as the board, does not generally have the power to bind a successor to the substantive provisions of a collective bargaining agreement to which it is not a party. We decline, however, to adopt that position at this juncture. Clearly, the holding in *Burns* does not require that result.

> \* \* \* \* \* \*

> To remove or to restrict to the point of meaninglessness the power of an arbitrator to perform his task in the manner *Wiley* envisioned—that is, to bring his informed judgment to bear in determining which, if any contract terms should survive—would be, we believe, an unwarranted application of *Burns*.

> \* \* \* \* \* \*

> Whatever may be the ultimate effect of *Burns*, further elaboration is unnecessary to illustrate that there are adequate reasons for not reading that decision as indicative of a national labor policy that precludes an arbitrator from binding a successor to substantive provisions of a prior existing collective bargaining agreement." 492 F.2d at 725, 726, 727.

*Gypsum II* was decided before *Howard Johnson*. After *Howard Johnson*, in *Boeing Company v. International Association of Machinists and Aerospace Workers*, 504 F.2d 307 (5th Cir. 1974), the Fifth Circuit again considered the Wiley-Burns conflict. Citing *Gypsum II* with approval, the Court stated:

> "We are confident, however, that even at the most *Burns* has not overruled the principles of *Wiley*." 504 F.2d at 311.

This case is a suit to compel arbitration under Section 301 of the Labor Management Relations Act. Thus, under the approach taken by the Fifth Circuit, the Court must decide whether, as in *Wiley*, there is in this case such a substantial continuity in the business enterprise that the duty to arbitrate under the prior collective bargaining agreements is not "something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved." 376 U.S. at 551, 84 S.Ct. at 915. The Court need not reach the question of whether or not the Respondents are bound by any or all of the substantive provisions of their predecessor's contracts. That question is for the arbitra-

tor in the first instance, subject to judicial review. *Gypsum II*, 492 F.2d at 726 n. 23, 727.

The Court is mindful of the caveat in *Howard Johnson* that each case must be determined upon its own facts:

". . . [T]he real question in each of these 'successorship' cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative? The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of 'successor' which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others." 417 U.S. at 262 n. 9, 94 S.Ct. at 2243.

■ In the instant case, Respondents took over the assets of the predecessor corporations after extensive negotiations with Wilson. Thereafter, they continued the operation of the nursing homes in substantially the same manner. Moreover, the parties have stipulated that Respondents retained substantially all of Wilson's former employees, thus establishing the "substantial continuity of identity of the work force" absent in *Howard Johnson*. Thus the same factors which lead the *Wiley* Court to impose a duty to arbitrate upon the successor are present here as well. Accordingly, the Court will GRANT the Union's Motion to Compel Arbitration.

It is important to note that the Court does not hold here that Respondents are necessarily bound by the terms of their predecessor's agreements—though they *are* required to arbitrate claims arising out of an alleged breach of that agreement subject to judicial review. Whether or not any of the substantive terms of the agreement are binding is a question for the arbitrator to decide. The Court holds only that, under

the facts of this case, there is such substantial continuity in the business enterprise—a part of which is evidenced by the continuity of identity in the work force—that the Respondents are subject to the duty to arbitrate.

B. *The Injunction*

■ Having found that Respondents must arbitrate the question of its obligations under the collective bargaining agreements, the Court must now decide whether or not to enjoin Respondents from making any transfer of the nursing homes pending the outcome of the arbitration.

The Court is of the opinion that the Motion for Preliminary Injunction should be denied. The Union failed to establish at the hearing that any transfer of the homes was at all "imminent." Rather the testimony revealed that Keller was desirous of selling the homes—if he could find a buyer. Keller testified that the real estate taxes on the property are almost two years past due. Too, the homes are about twenty years old and in disrepair; and since the homes meet only the standards of the early 1960's, if closed, they would not be able to reopen without substantial improvements. In short, as Keller stated, if he cannot sell the homes soon, his only alternative is to go out of business.

In this context, the Court finds that the potential harm to Respondents of an injunction would outweigh the potential harm to petitioners. Respondents should be free to offer the homes on the market unfettered by the restraints of a Court Order which would certainly inhibit the ability of Respondents to find a purchaser.

Further, the Court finds that an injunction would not serve the best interests of the public. If the homes were to close, relocation of the patients would be a very traumatic experience for these patients—even assuming that suitable alternative accommodations were available.

Thus, where the risk of harm to Petitioner at this time is speculative, and the harm to the Respondents and the public outweigh the potential harm to Petitioners, an injunction is improper. *Buchanan v. United*

*States Postal Service,* 508 F.2d 259 (5th Cir. 1975).

This Opinion shall constitute the Findings of Fact and Conclusions of Law pursuant to F.R.C.P. 52(a).

In view of the foregoing, it is—

ORDERED AND ADJUDGED as follows:

1. The Union's Motion to Compel Arbitration is hereby GRANTED. The parties are directed to begin compliance with the provisions for arbitration pursuant to Articles 9 and 23 of the subject collective bargaining agreements within five (5) days from the date hereof.

2. The Union's Motion for Preliminary Injunction is hereby DENIED; provided, however, that Respondents and/or their officers and agents are ordered and directed to give ten (10) days prior written notice by registered mail to the Union of any pending closing of a transaction directly or indirectly involving the sale, (assets or stock), lease, merger or any other disposition of the subject nursing homes.

3. The Court retains jurisdiction to enforce the provisions of this Order.

DONE AND ORDERED at Miami, Florida this 17 day of August, 1977.