INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA–UAW, et al., Plaintiffs,

v.

GOODYEAR AEROSPACE CORP., et al., Defendants.

No. C86–4873A.

United States District Court, N.D. Ohio, E.D.

Nov. 14, 1986.

On Motion for Preliminary Injunction Nov. 19, 1986.

Betty Grdina, Bobulsky, Gervelis & Grdina, Ashtabula, Ohio, for plaintiffs.

Edward Kaminski, James Kurek, Buckingham, Doolittle & Burroughs, Bruce DeYoung, Akron, Ohio, for defendants.

## MEMORANDUM OPINION

DOWD, District Judge.

### INTRODUCTION

On November 13, 1986 plaintiffs filed a complaint with an application for a temporary restraining order (TRO). Plaintiffs are the United Auto Workers (UAW), both the international and Local No. 856. The defendants are Goodyear Aerospace Corporation and Goodyear Tire & Rubber Company. Goodyear Aerospace Corporation is a wholly owned subsidiary of Goodyear Tire & Rubber Company. The UAW and its Local 856 have been the exclusive bargaining representatives for the hourly production and maintenance workers employed by defendant Goodyear Aerospace Corporation.

The UAW and Goodyear Aerospace are parties to a collective bargaining agreement for a term from August 11, 1985 through August 10, 1988. The agreement contains a "successor clause" at Article XV, and paragraph 394 describes its "assignability" which states:

This Agreement shall be binding upon the successors and assigns of the parties hereto and no provisions, terms, or obligations herein contained shall be affected, modified, altered or changed in any respect whatsoever by the consolidation, merger, sales, transfer, or assignment of either party hereto, or affected, modified, altered, or changed in any respect whatsoever by any change of any kind in the legal status, ownership, or management of either party hereto.

The above clause of the collective bargaining agreement is the focus of this dispute.

In the Union's complaint and TRO application, the union seeks to enjoin an allegedly impending sale of Goodyear Aerospace Corp. to a Martin-Marietta corporation unless and until Goodyear Aerospace makes assumption of the collective bargaining agreement now in effect between Goodyear and the Union, a condition of the written sales agreement with the buyer. Alternatively, the Union seeks to enjoin the sale pending an arbitrator's resolution of the question whether the language in Article XV of the Union contract requires Goodyear to insert such a condition of sale into any sales agreement.

On the same day the TRO application was filed, the Court met informally with counsel, and advised counsel that the Court would conduct a formal hearing the next morning. The Court instructed counsel to file briefs before the hearing. On November 14, 1986 after the parties had filed their briefs, the Court conducted a hearing on the application for a temporary restraining order. For the reasons that follow, the Court grants the Union's application for a temporary restraining order until 4:00 p.m. on Tuesday, November 18, 1986.

## I. THE EVIDENCE BEFORE THE COURT

At the hearing, Michael Sprouse, the chairman of the Local Union Executive Bargaining Committee, testified that he believed that the Union had the right to arbitrate all disputes arising out of the collective bargaining agreement. He stated that the local union filed a grievance alleging that Goodyear Aerospace had violated Article XV, paragraph 394 of the collective bargaining agreement by refusing to agree to include the requirement that the buyer of Goodyear Aerospace Corporation assume the current collective bargaining agreement as a condition of the sale. The union contends that Goodyear Aerospace's refusal to include such a requirement in the written sales agreement violates the collective bargaining agreement, and requests an arbitration of their grievance.

Sprouse also testified that he is personally aware that Goodyear Aerospace Corporation intends to sell its assets. He testified to the announcement of Robert W. Clark, the president and chief executive officer of Goodyear Aerospace, in which Clark indicated that Goodyear's Board of Directors had decided to attempt to sell its subsidiaries, such as Goodyear Aerospace

Corporation. A copy of the announcement is attached to this memorandum opinion as Exhibit 1. Sprouse also testified that he spoke directly with Clark about the potential sale of Goodyear Aerospace Corporation. Sprouse also testified that he talked directly to Lenny Layden, vice president of manufacturing for Goodyear Aerospace Corporation, who stated that a sales agreement between Goodyear Aerospace and Martin Marietta Corporation might be executed by November 20, 1986. Sprouse testified that he has seen officials from prospective buyers visiting Goodyear Aerospace facilities, and that on the very morning of the hearing, Aerospace personnel requested the union's executive bargaining committee to meet directly with officials from Martin Marietta.

In response to questioning by the Court, Sprouse described the grievance process applicable to the grievance filed by the Union. After a written grievance is filed, the union holds a meeting with the company. The meetings are held Wednesday of each week. The union presents its case and requests a settlement. The company must file a written response in ten days. Twenty days after the company's response, the union indicates whether it intends to certify the grievance to arbitration. The union certifies the grievance to arbitration, and an arbitration is scheduled. Sprouse testified that the time between filing and arbitration may vary from six weeks to one year.

Warren Davis, the regional director of the International Union of the United Auto Workers, and a member of the International Union's Board, testified that he spoke to Robert Clark on Tuesday, November 11, 1986, by telephone to request a meeting with Clark. Davis stated that Clark told him a meeting on November 12, 1986 would not be possible because he was committed to meet with personnel from Martin Marietta. Davis stated that he and Clark discussed the issue of the successor clause, and that Clark stated to Davis that Goodyear Aerospace intended to honor the collective bargaining agreement, but would not place the successor clause in a written sales agreement as a condition of sale.

Davis testified that he also spoke with Layden on November 11, 1986, and that Layden also stated that Goodyear Aerospace intended to honor the collective bargaining agreement, but would not place successor clause in a written sales agreement as a condition of sale.

Davis also testified that the Union will suffer irreparable harm if the successor clause is not included in any proposed sales agreement between Goodyear Aerospace and a potential buyer. Davis stated that without the successor clause, the purchaser of the Aerospace could fire current Goodyear Aerospace workers and replace them with new workers. He noted that the Union's status as the representative of the Goodyear Aerospace workers would be lost and that these types of damages are not remediable by money damages. Davis also testified that the International Union could take steps to expedite the arbitration process, and that the arbitration process might take far less time than the time testified to by Sprouse.

The defendants introduced no testimony at the hearing. The defendants relied instead on the affidavit of Robert C. Clark, the president and chief executive officer of Goodyear Aerospace Corporation. Clark's affidavit is attached to this opinion as Exhibit 2. Clark attests that there is no contract of sale presently negotiated by Goodyear Aerospace or Goodyear Tire & Rubber Company regarding the sale of Goodyear Aerospace, and that Goodyear Aerospace intends to honor its obligations under the existing collective bargaining agreements. Clark also attests that the granting of the TRO "would hamper and impede Goodyear's efforts to negotiate effectively and efficiently a sale with the prospective buyer that would be in the best interest of all [Goodyear Aerospace] employees." Further, Clark attests that the temporary restraining order "would impair the defendant's ability to sell [Goodyear Aerospace]. If [Goodyear Aerospace] is not the subject of a timely sale, [Goodyear Tire & Rubber Company] will be denied the proceeds of the sale which are necessary for its restructuring program which could result in

irreparable damage to [Goodyear Tire & Rubber Company, Goodyear Aerospace], their employees and the communities in which they operate."

## CONCLUSIONS OF LAW

■ The union alleges jurisdiction under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, which confers jurisdiction upon federal district courts for suits involving breach of collective bargaining agreements. The union claims that the defendants have breached the contract by refusing to insert a provision into any potential sales agreement for Goodyear Aerospace that the sale is conditioned upon the buyer assuming the collective bargaining agreement. The defendants assert that the Court lacks jurisdiction, however, because the injunction requested is prohibited under the Norris-Laguardia Act, 29 U.S.C. §§ 101 *et seq.*

The Norris-Laguardia Act contains broad prohibitions against the issuance of injunctions in labor disputes. There are some narrow exceptions to the rule, however. For example, if a collective bargaining agreement contains both a binding arbitration clause and a no-strike clause, and if a subsequent strike involves an arbitrable grievance, an employer can obtain an injunction against the strike. *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). If the strike results from an underlying dispute which is not arbitrable, however, no injunction can issue against the strike. *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976).

In a so-called "reverse *Boys Markets*" situation, the same principles apply to injunctions against employer breaches of a labor agreement. *Machinists Local Lodge 1266 v. Panoramic Corp.*, 668 F.2d 276 (7th Cir.1981). It is this "reverse *Boys Markets*" situation that is before the Court in the present case.

In *Aluminum Workers International Union, AFL–CIO, Local Union No. 215 v. Consolidated Aluminum Corporation*, 696 F.2d 437 (6th Cir.1982), the Court set forth the guidelines which this Court must follow in deciding whether to enjoin the contemplated action of the defendants in this case.

First, the union must establish that the underlying grievance is one which is arbitrable. The company has publicly announced its intention to sell Aerospace, but it has refused the union's request to insert a successor clause into any proposed sales agreement. The union filed a grievance asserting that under the union's interpretation of the collective bargaining agreement, the company was in breach by refusing to agree to insert the requested successor clause into a proposed sales agreement.

The United States Supreme Court has declared with respect to whether an arbitration clause is susceptible to an interpretation that covers the asserted dispute that doubts should be resolved in favor of coverage. *United Steelworkers v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 582–3, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960).

Based upon the state of the evidence and the application of the presumption in favor of coverage, the Court finds that the union has established that the parties are engaged in arbitrable dispute. Thus the first requirement for the issuance of an injunction has been met.

Secondly, in addition to establishing arbitrability, the union must prove its entitlement to an injunction under ordinary equity principles. As the *Aluminum Workers* court summarized it:

Specifically, the union must demonstrate that breaches of the agreement are occurring and will continue, or have been threatened and will be committed; that the union has suffered or will suffer irreparable harm as a result; and that the union will suffer more from the denial of the injunction than the company will from its issuance. 696 F.2d at 442 (quoting *Boys Markets, supra*, 398 U.S. at 254, 90 S.Ct. at 1594.)

The Court finds that the union has demonstrated that a breach of the collective bargaining agreement has been threatened.

The threat is implicit in the letter announcing to employees that Goodyear Aerospace was up for sale, and in the company's refusal to insert the condition of sale clause requested by the union into the sales agreement.

The Court also finds that the union has demonstrated that it will suffer irreparable harm if the injunction is not granted. If the sale of Goodyear Aerospace is consummated as contemplated by the defendants, there is nothing to stop the buyer from rejecting the union contract, from changing working conditions, or even from replacing the entire present work force with new employees. *See Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *NLRB v. Burns Detective Agency,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). As was the situation in the *Panoramic* case, *supra,* consummation of the sale in this case would present an arbitrator in future with a *fait accompli* and would leave him without any power to remedy the situation.

In considering the balance of hardships or competing interests involved, the Court is troubled by the fact that the defendants have not put into the record any evidence of the hardship that Goodyear will suffer if the Court issues an injunction. The Court is certainly aware of the much publicized hostile takeover attempt of Goodyear Tire & Rubber Company by Sir James Goldsmith. The Court is also aware of Goodyear's efforts to fight the takeover. The problem is that the defendants did not present any specific evidence of how an injunction will harm Goodyear Aerospace and/or Goodyear Tire & Rubber; the extent of the harm that would be suffered, either by Goodyear itself and/or by the entire Akron area community; or even if any irreparable harm will occur from the issuance of the injunction. There is nothing before the Court to indicate that a sale of Goodyear Aerospace will prevent or assist in preventing the hostile takeover in any event.

## IV. CONCLUSION

For the reasons discussed above, the Court grants the plaintiffs' motion for a temporary restraining order, and accordingly enjoins the defendant Goodyear Aerospace Corporation from entering into any sales or purchase agreement relating to the assets of Goodyear Aerospace unless the sales agreement includes a provision requiring the buyer to assume, as a condition of sale, the obligations of the collective bargaining agreement between the plaintiffs and Goodyear Aerospace Corporation, or until the dispute between the plaintiffs and Goodyear Aerospace Corporation about the interpretation of Article XV, paragraph 394 of the collective bargaining agreement can be submitted to arbitration. The Court conditions the restraining order upon the posting of a bond by the plaintiffs in the amount of $25,000.00. The order will expire at 4:00 p.m. on November 18, 1986 unless extended by order of the Court. Further, at 1:00 p.m. on November 18, 1986, the Court will conduct a preliminary injunction hearing, at which the Court will focus upon the issue of the competing interests involved in the injunction.

IT IS SO ORDERED.

## EXHIBIT 1

### GOODYEAR AEROSPACE CORPORATION

### AKRON, OHIO 44315

Nov. 6, 1986

Dear Fellow Employees:

Goodyear's Board of Directors met yesterday. As a result of their deliberations appropriate to the rejection of the potential takeover by Sir James Goldsmith, the following news release will be made this morning:

"The Board of Directors of The Goodyear Tire & Rubber Company has authorized officers of the Company to initially buy up to 20 million shares of the Company's outstanding common stock in the open market, Chairman Robert E. Mercer announced today.

"Mercer also announced that in addition to the possible sale of its Celeron subsidiary, as announced earlier this week, the Company has under consideration the sale of two other subsidiaries—Goodyear Aerospace Corporation and Motor Wheel Corporation.

"The possible sale of these assets and the open market stock purchase program, as well as stringent cost reduction programs, are preliminary steps in an overall restructuring program being developed by the Company and its financial advisors, Goldman Sachs and Company and Drexel Burnham Lambert, Inc."

This means that, with the full support of The Goodyear Tire & Rubber Company, your GAC officers will be actively seeking potential buyers for GAC.

While this activity is ongoing, Ray Stankard will be managing the day-to-day operations of GAC while I head the team that is seeking a buyer.

In the interim we have a very clear need to do the following:

—Continue to support Goodyear in its efforts to defend against the potential takeover by Mr. Goldsmith.

—Work as smart and hard as we can to make GAC the best aerospace corporation in our business.

—Concentrate our actions to provide the best quality products at the lowest costs.

—Continue—to the best of our ability—to PROTECT OUR GOOD NAME.

I wish you all could share my office and hear the wonderful offers of support for the corporation that are surfacing from throughout GAC.

Thank you for these thoughtful offers. As appropriate, we will be accepting some of the offers in the near future.

Teamwork is the name of the game. Hang in there. We will keep you posted as events take place.

Please remember—GAC is a very good company because of our people. Whatever the outcome, nothing can detract from our strengths.

In fact, we will be stronger in the future.

Robert W. Clark
President and Chief
Executive Officer

## EXHIBIT 2

### AFFIDAVIT OF ROBERT W. CLARK

Robert W. Clark, President of Goodyear Aerospace Corporation, being first duly sworn, deposes and says as follows:

1) There is no contract of sale presently negotiated with any company or person by either Goodyear Aerospace Corporation (GAC) or The Goodyear Tire & Rubber Company (GT & R) regarding the sale of GAC.

2) GAC is merely furnishing material to interested parties who may wish to evaluate the possibility of purchasing GAC.

3) Due to the size of GAC, a company with estimated sales in excess of 800 million dollars in 1986, a sufficient period of time is necessary to negotiate and effectuate a sale of GAC.

4) GAC has indicated to the leaders of UAW Local 856 that it intends to honor existing contract obligations including the collective bargaining agreement with the UAW.

5) Furthermore GAC and its investment banker, Drexal, Burnham & Lambert, Inc., have established that any union contracts between GAC and the United Auto Workers (UAW) will be disclosed to all interested parties and accordingly the ultimate buyer will have complete and full knowledge of the obligations of GAC pursuant to the collective bargaining agreement with the UAW.

6) If the court grants the TRO requested by the plaintiff, such action would hamper and impede Goodyear's efforts to negotiate effectively and efficiently a sale with a prospective buyer that would be in the best interests of all GAC employees.

7) If the court should grant the TRO, it would impair the defendant's ability to sell GAC. If GAC is not the subject of a timely sale, GT & R will be denied the proceeds of the sale which are necessary for its re-

structuring program which could result in irreparable damage to GT & R, GAC, their employees and the communities in which they operate.

FURTHER AFFIANT SAYETH NAUGHT.

/s/Robert W. Clark
Robert W. Clark

Sworn to before me and subscribed in my presence this 13th day of November 1986.

/s/Bert Bell
NOTARY PUBLIC

## ON MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

On November 13, 1986, the plaintiffs, International Union, United Automobile, Aerospace & Agricultural Implement Workers of America and its Local No. 856 (UAW), filed a complaint with an application for a temporary restraining order and a motion for a preliminary injunction. The defendants are Goodyear Aerospace Corporation (GAC) and Goodyear Tire and Rubber Company (GTR). On November 14, 1986 the Court granted, over the objections of GAC and GTR, a temporary restraining order (TRO) enjoining the sale of GAC to a buyer absent an agreement of GAC to include in the sales agreement a provision binding the buyer to the existing collective bargaining agreement or until the grievance filed by UAW with GAC on November 12, 1986 could be resolved between UAW and GAC, either by agreement or by arbitration as contemplated by the collective bargaining agreement.

The TRO was granted until 4:00 p.m. on November 18, 1986 at which time it would expire unless extended. The Court scheduled a hearing on the motion of UAW for a preliminary injunction for 1:00 p.m. on November 18, 1986 and thereafter conducted the hearing as scheduled. At the conclusion of the hearing, the Court announced that the TRO would be extended until Thursday, November 20, 1986 at 4:30 p.m. and further indicated that a decision would be forthcoming by that time, either granting the motion for a preliminary injunction or denying the same.

After consideration of the evidence presented at the hearings on November 14 and November 18, 1986, the Court finds that the temporary restraining order should be vacated as of 4:30 p.m. on November 20, 1986 and the motion of UAW for a preliminary injunction to enjoin the proposed sale of GAC unless the sales agreement contain provisions requiring the buyer to honor the existing collective bargaining agreement and other agreements between UAW and GAC or until the grievance can be fully arbitrated, is denied for the reasons that follow.

### I. SUMMARY OF LAW APPLICABLE TO FEDERAL COURT INJUNCTIONS IN LABOR DISPUTES.

The union alleges jurisdiction under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, which confers jurisdiction upon federal district courts for suits involving breach of collective bargaining agreements. The union claims that the defendants have breached the contract by refusing to insert a provision into any potential sales agreement for GAC that the sale is conditioned upon the buyer assuming the collective bargaining agreement. The defendants assert that the Court lacks jurisdiction because the requested injunction is prohibited under the Norris-Laguardia Act, 29 U.S.C. §§ 101 *et seq.*

The Norris-Laguardia Act contains broad prohibitions against the issuance of injunctions in labor disputes. There are some narrow exceptions to the rule, however. For example, if a collective bargaining agreement contains both a binding arbitration clause and a no-strike clause, and if a subsequent strike involves an arbitrable grievance, an employer can obtain an injunction against the strike. *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 254, 90 S.Ct. 1583, 1594, 26 L.Ed.2d 199 (1970). If the strike results from an underlying dispute which is not arbitrable, however, no injunction can issue against the strike. *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 407–08, 96 S.Ct. 3141, 3147–48, 49 L.Ed.2d 1022 (1976).

In a so-called "reverse *Boys Markets*" situation, the same principles apply to injunctions against employer breaches of a labor agreement. *Machinists Local Lodge 1266 v. Panoramic Corp.*, 668 F.2d 276, 280 (7th Cir.1981). It is this "reverse *Boys Markets*" situation that is before the Court in the present case.

In *Aluminum Workers International Union v. Consolidated Aluminum Corporation*, 696 F.2d 437 (6th Cir.1982), the Court set forth the guidelines which this Court must follow in deciding whether to enjoin the contemplated action of the defendants in this case.

First, the union must establish that the underlying grievance is one which is arbitrable. Secondly, in addition to establishing arbitrability, the union must prove its entitlement to an injunction under ordinary equity principles. As the *Aluminum Workers* court summarized it:

> Specifically, the union must demonstrate that breaches of the agreement are occurring and will continue, or have been threatened and will be committed; that the union has suffered or will suffer irreparable harm as a result; and that the union will suffer more from the denial of the injunction than the company will from its issuance. 696 F.2d at 442 (quoting *Boys Markets, supra,* 398 U.S. at 254, 90 S.Ct. at 1594).

The United States Supreme Court has declared with respect to whether an arbitration clause is susceptible to an interpretation that covers the asserted dispute that doubts should be resolved in favor of coverage. *United Steelworkers v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960).

Based upon the state of the evidence and the application of the presumption in favor of arbitrability, the Court finds that the union has established that the parties are engaged in arbitrable dispute.

The UAW and GAC are parties to a collective bargaining agreement for a term from August 11, 1985 through August 10, 1988. The agreement contains a "successor clause" at Article XV, and paragraph 394 describes its "assignability" as follows:

> This Agreement shall be binding upon the successors and assigns of the parties hereto and no provisions, terms, or obligations herein contained shall be affected, modified, altered or changed in any respect whatsoever by the consolidation, merger, sales, transfer, or assignment of either party hereto, or affected, modified, altered, or changed in any respect whatsoever by any change of any kind in the legal status, ownership, or management of either party hereto.

At article IV, section II, paragraphs 192 and 193, the collective bargaining agreement discusses the arbitrator's powers as follows:

> The Arbitrator shall not have the power to make any award changing, amending, or adding to the provisions of this agreement.

> Specifically, the Arbitrator shall not have the power to arbitrate general wage levels or maximum or minimum rates of existing classifications, *and the only grievances which may be submitted to the said Arbitrator for hearing and determination shall be those arising out of alleged violation or misinterpretation of the provisions of this agreement*
> . . . .

The Union interprets the successor clause in paragraph 394 to mean that if management intends to sell the company, management must include as a condition of the sale that the buyer assume the collective bargaining agreement now in effect. The company interprets the successor clause language differently. The company asserts that the language does not require the company to insert any such clause into a sales agreement. In short, there is a dispute here as to the meaning and interpretation of certain language contained in the collective bargaining agreement. While it is not the function of this Court to decide whose interpretation is correct, such a dispute about interpretation presents the classic case of an arbitrable dispute. The Court therefore adheres to its position that the underlying dispute in this case is arbi-

trable. Under *Aluminum Workers, supra,* the Court must therefore proceed to the question of the union's entitlement to a preliminary injunction under ordinary principles of equity.

## III. ORDINARY PRINCIPLES OF EQUITY.

### A. *Breach or the Threat of Breach.*

■ Under the *Aluminum Workers* decision, the union must demonstrate that a breach of the collective bargaining agreement is occurring or has been threatened. For the reasons stated in its memorandum opinion filed November 14, 1986, the Court finds that the union has demonstrated that arguably a breach of the collective bargaining agreement has been threatened. The company has publicly announced its intention to sell Aerospace, but it has refused the union's request to insert a successor clause into any proposed sales agreement. The threat of breach is implicit in that announcement and in the defendants' subsequent refusal to impose the successor clause on a buyer.

Under applicable case law, the successor clause does not necessarily mean what it says it means, i.e., that the agreement "shall be binding upon the successors and assigns of the parties hereto...." *See Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *NLRB v. Burns Detective Agency,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). The union's position is that the only way to make sure the successor clause is enforceable against a purchaser of GAC is for the company to make it part of the binding contract of sale. This is the reason why the union claims that a refusal to insert such a binding provision is a breach of the collective bargaining agreement. Since management has refused to insert such a provision into a sales agreement, the Court is not hesitant to find that arguably a breach of the collective bargaining agreement is threatened.

### B. *Irreparable Harm.*

■ The Court also finds that the union has demonstrated that it may suffer irreparable harm if the injunction is not granted. If the sale of Goodyear Aerospace is consummated as contemplated by the defendants, there is nothing to stop the buyer from rejecting the union contract, from changing working conditions, or even from replacing the entire present work force with new employees. *See Howard Johnson Co., supra,* and *Burns, supra.* As was the situation in the *Panoramic* case, *supra,* consummation of the sale in this case would present an arbitrator in future with a *fait accompli* and would leave him without any power to remedy the situation. The Court discussed at length this dilemma at the preliminary injunction hearing held November 18, 1986. Defense counsel was unable to articulate to the Court a solution to the dilemma. Based upon applicable law and the testimony and oral arguments presented at the hearings held on November 14, 1986 and November 18, 1986, the Court concludes that the union has demonstrated that it may suffer irreparable harm if the injunction is not granted.

### C. *Competing Interests.*

As outlined in its memorandum opinion filed November 14, 1986, the Court adheres to its position that the underlying dispute in this case is arbitrable; that arguably a breach of the collective bargaining agreement has been threatened; and that the union may suffer irreparable harm as a result. The final but very important factor which the Court must consider is the factor of competing interests, *i.e.,* "that the union will suffer more from the denial of the injunction than the company will from its issuance." *Aluminum Workers, supra,* 696 F.2d at 442.

The Court has carefully reviewed the case law discussing the competing interests or balance of hardships involved in deciding upon injunctive relief. About the most that can be said is that each case turns on its particular and unique facts.

In *Panoramic, supra,* 668 F.2d at 288, the Court discussed the balance of hard-

ships factor in the case before it. At issue was the defendant company's proposed sale of one of its divisions. The Court found that the proposed sale threatened 113 employees with permanent loss of employment. The company, on the other hand, asserted that its lost opportunity to sell the division amounted to a dollar amount of $4,520,000.00. The court affirmed the district court's finding that the harm to the union outweighed the financial injury to the company. The court was careful to note, however, that the company in that case was not financially compelled to sell the division in question. The court stated:

[The company's] decision to sell the Division was motivated not by any financial imperative but rather by the incompatibility of the Division with Panoramic's other operations. 668 F.2d at 289.

After examining the particular facts before it, the Court of Appeals held that the district court did not abuse its discretion in granting an injunction against the proposed sale. The court did issue a word of caution, however, which seemed to emphasize the point that injunctions such as the one requested here are not to be issued lightly. The Court stated:

We are not unaware, however, that routine issuance of injunctions against the sale of businesses could in many cases be extremely disruptive and costly. Hence we emphasize the need for searching analysis of the facts and law peculiarly applicable to each case when confronted by a request for the sort of injunction sought here. *Id.*

In another case, *Local 1115 Joint Board Nursing Home and Hospital Employees v. B & K Investments, Inc.,* 436 F.Supp. 1203 (S.D.Fla.1977), plaintiff union sought to enjoin a proposed sale of the defendant company's nursing homes. The court denied injunctive relief. In balancing the competing interests involved in that case, the court noted that the union's harm would be of the same nature as the UAW's potential harm in the present case. The union in the *Local 1115* case, however, was unable to show that a sale was imminent, and in fact, the evidence showed that the defendant wished to sell the homes *if only*

*he could find a buyer.* The Court in considering the harm to the company noted that the company's inability to sell the homes quickly meant that the company would go out of business because it did not have the money to rehabilitate the old nursing homes which were in disrepair. The court also considered the interests of the public if in fact the company did go out of business. In considering this potential harm, the court stated:

If the homes were to close, relocation of the patients would be a very traumatic experience for these patients—even assuming that suitable alternative accommodations were available. 436 F.Supp. at 1209.

In summary, under the facts of the *Local 1115* case, the court simply found that the union's risk of harm was speculative, while the harm to the company and to the public outweighed any potential harm to the union.

The Sixth Circuit has discussed the public interest factor in *Northcross v. Board of Education,* 444 F.2d 1184 (6th Cir.1971), a case not involving a labor dispute but centering upon a desegregation case where the district court denied a preliminary injunction against building new schools. While the plaintiffs claimed that the new schools would foster segregation, the evidence showed that they might in fact have the opposite effect. In addition, the court noted that new schools were badly needed in the community. The Sixth Circuit therefore affirmed the district court's denial of a preliminary injunction against building the new schools.

In summary, while the injunction cases discussing the competing interests factor all turn upon the peculiar facts of each case, certain common threads seem to be woven throughout the opinions. The first is that a threatened permanent loss of jobs is a very weighty factor on the union's part. The second is that it is important to consider whether a company's decision to sell is compelled by economic necessity. If it is not so compelled, but rather made as part of an ordinary business decision, the scales tip in favor of the union's harm in

potential job loss. However, if a company's action is compelled by economic necessity, the courts seem to place more emphasis on the harm that might result both to the company and to the public at large.

In considering the balance of hardships or competing interests involved in the present case, after the initial TRO hearing held on November 14, 1986, the Court was troubled by the fact that the defendants had not put into the record any evidence of the hardship they would suffer if the Court issued an injunction. At that initial hearing, the defendants did not present any specific evidence of how an injunction would harm Goodyear Aerospace and/or Goodyear Tire & Rubber; the extent of the harm that would be suffered, either by Goodyear itself and/or by the entire Akron area community; or even if any irreparable harm would occur from the issuance of the injunction. The Court therefore issued the requested TRO for a limited four-day period and indicated that at the November 18, 1986 preliminary injunction hearing the Court would focus upon the issue of competing interests involved in the injunction.

Based upon the testimony and exhibits submitted into evidence at the November 18, 1986 preliminary injunction hearing, the Court finds the scales have now tipped in favor of the defendants. Following is a summary of the evidence composing the record of the November 18, 1986 preliminary injunction hearing.

A. *The Testimony of Donald R. Ebner.*

Donald R. Ebner is the director of Industrial Relations at GAC, and was involved in negotiating the collective bargaining agreement presently in effect between the UAW and Aerospace. The Court considers his testimony against the somewhat unusual background of this case: that an Englishman named Sir James Goldsmith is attempting a much publicized hostile takeover of GTR, the parent corporation of GAC, and that GTR is attempting to prevent the takeover.

In order to raise money to prevent the takeover, GTR has made a corporate decision to sell some of its wholly owned subsidiaries, one of which is GAC. Mr. Ebner testified that the timing of the sale of GAC is "very important" (Tr. 35) for the following reasons:

In the sale of the business, if Goodyear is allowed to make arrangements for the sale, we have the opportunity then to find a company that we would be able to work with that would have the same interest in us as we would have in them, the engineering and products and technology and this type of thing.

If we can get sold to a company of that nature, then we would be able to provide job security and continue our operations as such.

If on the other hand, we don't meet the time schedule for the restructuring of Goodyear as it's been laid out, we could end up in what they term the auction block. And that would be whoever bought it then, anybody, they may or may not be interested in Goodyear, its product or employees.

They may just decide to sell the assets and whatever. And we feel it's to our employees' benefit and our benefit to be able to make the selection ourselves rather than have somebody else do it for us. Tr. 35–36.

*See also* Tr. 48–49.

Mr. Ebner testified as to why it would be dangerous to insert the successor clause as a condition of sale, as the union demands. He stated that GTR had represented to potential buyers, specifically Martin-Marietta Corporation, that there was a "very good labor relations environment" at GAC. Tr. 42. He testified that based upon his experience in the past of examining potential prospects for Goodyear to buy, the labor relations of a company are an important factor in another company's decision to buy. If the condition requested by the union is inserted into the sales agreement, Mr. Ebner testified that based upon his experience this clause would make potential buyers worry that there must indeed be labor strife occurring at GAC, and that this would make them hesitant to go through with the purchase. Tr. 36–38.

Other GAC contracts would be affected by a Court order granting the union's request, testified Mr. Ebner. For example, GAC has a pending naval airship contract with the United States Navy. GAC and (Mr. Ebner believes) only one other competitor, Westinghouse, are bidders for this contract which is a $150 million to $200 million contract. Mr. Ebner said that if GAC is the successful bidder and obtains the Navy contract, this will add about 400 new jobs. If GAC does not get the contract, there would be "some layoffs." Further, Mr. Ebner stated that if GAC lost the bid for the Navy contract, this would affect the saleability of GAC because "[i]f we had that contract in-house, we become a more valuable asset to whoever wants to buy us." Tr. 41.

Mr. Ebner stated that GTR has represented to the Navy that it has good labor relations with the UAW at GAC, and that the Navy is interested in labor relations "[b]ecause they want to be sure that whoever was awarded the contract could produce on the contract." Tr. 39–40. The Navy would use the naval airship, which is a huge blimp, for national defense purposes. The airship would keep surveillance over the Navy's fleet to alert the fleet of intercontinental ballistic missiles. Tr. 41.

Mr. Ebner identified defendants' exhibit A which is an economic impact study commissioned by GTR and done by Dr. Dennis Byrne, Professor of Economics at Akron University. The study concluded that the economic impact of the existence of Goodyear plants in Akron, Ohio, is an estimated $1 billion. Tr. 42–45. In conjunction with identifying defendant's exhibit C, a chart called "Economic Impact on Akron," Mr. Ebner testified about the local economic impact of such direct expenditures as payroll and withholding deductions of GAC, and United Way contributions of both GTR and GAC. The grand total, testified Mr. Ebner, is $224,998,288.00. Defendants' exhibit C also illustrates that GTR employs 8,000 people in Akron; that GAC employs 5,000 people in Akron; and that the total is 13,000 people in this community who are employed by GTR and GAC. Tr. 46–48.

Last but by no means least, Mr. Ebner identified and explained defendant's exhibit D, which is a chart showing the breakdown of personnel at GAC. As of October 1986, exhibit D shows that the Akron GAC plant employs a total of 5,180 people. Of those 5,180 employees, 3,563 are salaried, and 1,617 are hourly workers.

In response to questioning by the Court, Mr. Ebner stated the high degree of technology involved in GAC's work, contrary to most industrial concerns, has resulted in the salaried employees far outnumbering the union employees. The Court notes exhibit D shows that less than one third of the GAC employees are hourly workers covered under the collective bargaining agreement at issue here.

Once again, Mr. Ebner testified that the benefit of a quick and timely sale of GAC is that GTR will be able to control who buys the corporation so that in turn the new buyer will continue to run the business and employ the workers who are now employed. Tr. 48–49. Again, the Court is particularly concerned by the evidence supplied by defendant's exhibit D, that the workers now employed at GAC in Akron are not primarily UAW members; that in fact over two thirds of the workers at GAC are salaried employees who are not covered by any collective bargaining agreement.

Finally, Mr. Ebner testified that the company had advised the union that the company would expedite the grievance procedure, (Tr. 33–34) enabling an arbitrator to speedily render a decision as to the meaning of the language contained in article XV of the collective bargaining agreement.

### B. Testimony of John M. Sprouse.

John M. Sprouse is currently the chairman of the Executive Bargaining Committee for UAW Local 856. The relevant part of his testimony concerns the possibility of expediting the grievance procedure. Mr. Sprouse testified that the UAW and GAC were scheduled to have a "step three meeting" on Wednesday, November 19, 1986, the day following the hearing. A step three meeting is one where the company and union representatives attempt to re-

solve the grievance. If they cannot agree, normally the company has ten days to issue its decision on the grievance, and then the union has twenty more days to either accept management's decision or certify the grievance to arbitration. Mr. Sprouse testified, however, that the company does not have to wait ten days to decide the grievance, but can decide the grievance sooner. He also testified that the union does not have to wait twenty days and that the union could certify the grievance to arbitration within 24 hours after the company decides the grievance.

## C. *Testimony of Jonathan Knauss.*

The union called Jonathan Knauss as a rebuttal witness. He is employed by the International UAW as a financial analyst and has held this position for two years. Mr. Knauss's field of expertise is corporate mergers and acquisitions.

On direct examination, Mr. Knauss rendered his opinion that the sale of GAC will not help prevent a takeover by Goldsmith; that GTR has other funds available with which it could repurchase its stock so as to thwart the takeover attempt; that a short injunction of approximately two weeks would not intimidate potential buyers of GAC; and that the inclusion of the union's requested successorship clause in the sales agreement would not discourage buyers. He also commented upon defendant's exhibit A, which showed that the economic impact of GTR in Akron is approximately $1 billion. Mr. Knauss testified that a mere merger or acquisition, in and of itself, absent a major change in the company such as a plant closing, would have minimal impact on that figure in defendant's exhibit A.

Upon cross examination, Mr. Knauss admitted that his opinions were based upon data publicly available and that he is not privy to GTR's takeover strategy or to GTR's agreements, if any, that it has with Mr. Goldsmith.

## V. CONCLUSION ON COMPETING INTERESTS INVOLVED.

■ From the testimony and exhibits submitted at the November 18, 1986 preliminary injunction hearing, the Court concludes that the competing interests of the UAW and the defendants in this case weigh in favor of denying injunctive relief.

The decision is a most difficult one. On the one hand, the Court is faced with the union's very legitimate attempt to protect its own members. On the other hand, of equal concern to the Court is the composition of the work force at GAC. The evidence shows that less than one third of those workers are members of the UAW, and that over two thirds of the work force is not covered by the collective bargaining agreement. Defendants have testified that their intention is to find a buyer of GAC who will continue to run the business and keep the current work force in place. While the union has presented testimony that GTR could fight the takeover by means other than selling GAC, absent extraordinary circumstances it is not the place of the union to dictate the strategy which GTR must use to combat the takeover. The union has presented no evidence to impeach GTR's expressed intention to find a compatible buyer for GAC, and while the union has a legitimate concern that any new buyer *might* reject the union contract, the union has presented no evidence that this in fact will happen.

As an aside, the Court is mindful of the testimony presented regarding the impact of an injunction on the Akron community and on GTR itself. And although mindful of this testimony, the Court considers it of secondary concern. There are simply too many pros and cons, and not enough information before the Court, to know whether the Court's decision here will have an impact, whether good, bad, or indifferent, upon the takeover controversy and/or the Akron community. In denying injunctive relief here, the Court focuses primarily on the balance of hardships involved in the work force community of GAC itself: a work force consisting of less than one third of the employees who are affected by the condition of sale requested by the union.

Finally, the Court is mindful of the testimony regarding the expressed commitment

of both parties to an expedited arbitration proceeding. In the final analysis, it is not for this Court to decide the meaning of the language contained in article XV of the collective bargaining agreement. That decision is for the arbitrator, and hopefully it is one which can be resolved before a transfer of GAC assets, if any, ever takes place.

For the foregoing reasons, the Court concludes that it must deny the union's motion for a preliminary injunction.

## VI. CONCLUSION

Denial of this motion for a preliminary injunction does not prohibit the UAW from again renewing its efforts to obtain injunctive relief as the conditions may change.

The Court expects that both parties—the UAW and GAC—will engage in an all out effort to expedite the resolution of the dispute that gave rise to the filing of the grievance on November 12, 1986. In the event that the UAW should again seek injunctive relief based upon a change in circumstances, the Court will carefully examine the efforts of both parties to expedite the resolution of the grievance.

IT IS SO ORDERED.